Paul Eugene APPELGATE, Respondent,

v.

COMMISSIONER OF PUBLIC SAFETY, Petitioner, Appellant.

No. C3–86–1625.

Supreme Court of Minnesota.

March 20, 1987.

Hubert H. Humphrey, III, Kenneth H. Bayliss, III, St. Paul, for appellant.

William G. Moore, PACO Office Center, Fridley, for respondent.

AMDAHL, Chief Justice.

We granted the state's petition for review in order to decide whether the Court of Appeals erred in reversing the revocation of the license of Paul Eugene Appelgate for failing an implied consent test. The main issue relates to the circumstances under which police may make a limited investigative stop of a person in the area of a recently committed crime. The trial court, rejecting the recommendation of a referee, ruled that the stop was valid. The Court of Appeals reversed the trial court, ruling that the stop was invalid. *Appelgate v. Commissioner of Public Safety,* 399 N.W.2d 162 (Minn.Ct.App., 1987). In so doing, it ruled in part that the trial court had improperly made a finding not made by the referee who heard the evidence. Thus, the appeal also indirectly raises the issue of when a trial court is bound to decide a Fourth Amendment issue solely on the basis of the facts as found by a referee. Concluding that the trial court did not act improperly and that the state met its burden of establishing the validity of the stop, we reverse the decision of the Court of Appeals and reinstate the decision of the trial court.

The only witness testifying on the facts offered in justification of the stop was Hopkins Police Officer James Liddy. He testified to the following facts: (1) that at 2:25 a.m. on Friday, April 18, 1986, he received a report of a burglary in progress in an apartment in a large apartment complex in Hopkins; (2) that he immediately drove his car, a marked squad car, to the residential area right next to the part of the complex in which the burgled apartment was located, arriving there within a minute of the radio report; (3) that from where he stopped he could see the only means of exit by motor vehicle; (4) that at that time of day there is "very little, if any" traffic in the area; (5) that therefore "it was felt" that any vehicle seen leaving the area at that time could possibly be involved in the burglary; (6) that he saw a car coming from the area; (7) that the car made a "very prolonged stop" at a stop sign right near where Officer Liddy was stopped (he was "certain" that the driver "probably could see" the marked squad car); (8) that

he began following the car and immediately called for assistance from one of the two other squads responding to the burglary in progress; (9) that as he followed the car, the car made "another prolonged stop" at a different intersection; and (10) that at that point he put on his lights and stopped the car. Liddy approached the car on foot as the driver, Appelgate, got out. He told Appelgate why he was stopped, then peered into the car and saw no evidence suggesting that Appelgate had been involved in any burglary. However, he noted that Appelgate, who said he resided in the complex, appeared intoxicated. He therefore requested Appelgate to submit to a preliminary breath test, which Appelgate failed. Appelgate was then arrested for DWI and his car was impounded. The reading on the implied consent test was .10.

■ A limited investigative stop is lawful if the officer is able to articulate at the judicial hearing on the validity of the stop that he had a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). The officer makes his assessment on the basis of "all the circumstances" and "draws inferences and makes deductions-inferences and deductions that might well elude an untrained person." *Id.* at 418, 101 S.Ct. at 695. These circumstances include the officer's general knowledge and experience, the officer's personal observations, information the officer has received from other sources, the nature of the offense suspected, the time, the location, and anything else that is relevant.

■ We deal here with the specific issue of the stop of a motor vehicle near a recent crime. As Professor LaFave points out in his discussion of the issue, in a situation such as that presented to the police in this case "experience has shown that when a victim or witness cannot name the offender his apprehension is unlikely unless he is rather promptly found in the immediate area." 3 W. LaFave, *Search and Seizure* § 9.3(d) at 460 (2 ed. 1987). In such a

situation "the police must have some authority to freeze the situation." *Id.* at 461. Indeed, "[e]ven if the circumstances are such that no one person can be singled out as the probable offender, the police must sometimes be allowed to take some action intermediate to that of arrest and nonseizure activity." *Id.* LaFave isolates six factors that may be taken into account in determining the propriety of the stop of a motor vehicle in such a situation: (1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation. *Id.* Relevant cases of this court illustrating the application of the above principles include: *State v. L'Italien*, 355 N.W.2d 709 (Minn. 1984) ("light-colored van" seen leaving burglary scene in Hugo at 5:45 a.m. believed headed south on Highway 61 toward White Bear Lake; held, proper for White Bear Lake police to stop light-colored van, one of only two vehicles seen on Highway 61 coming from the north), and *State v. Walker*, 304 Minn. 590, 232 N.W.2d 212 (1975) (upholding investigative stop of car containing two black men on service road coming from area of motel in St. Louis Park shortly after receiving report that two black armed robbers had just left motel).

■ In this case the police had no description of the burglar or of any get-away vehicle. This fact should not put an end to the matter. As Professor LaFave makes clear in his analysis of the cases, there are "cases where the number of persons about in the area is so small that a stopping for investigation may be made without any description whatsoever." W. LaFave, *supra,* at 470. An example of several such cases cited by him is *People v. Juarez*, 35 Cal.

App.3d 631, 110 Cal.Rptr. 865 (1973) (upholding investigative stop of a person near a recently reported burglary where he was the only pedestrian in the vicinity of the burglary, which had occurred 10 minutes before). Significantly, the stopped vehicle in our case was observed coming from the apartment complex where the burglarized apartment is located within a few minutes after the report of the burglary in progress was made and at a time of day (2:25 a.m.) when there was "very little if any" traffic in the area. Further, the officer was "certain" that Appelgate "probably" saw him in the marked squad car, a fact that objectively gives added significance to Appelgate's unusual driving behavior, specifically, the "very prolonged" stopping of the car at the first intersection and "another prolonged stop" at the next intersection. Looking at the totality of the circumstances—the whole picture—we conclude that the officer had a particularized and objective basis for at least suspecting that Appelgate had been involved in the burglary and that the officer therefore was justified in subjecting Appelgate to a limited investigative stop for the purpose of "freezing" the situation.

■ In the interest of preventing future error, we note our disagreement with the Court of Appeals' conclusion that the trial court based its decision in part on an improper finding of fact. One of the trial court's findings was a finding, made in the memorandum attached to its order, that the officer saw defendant's car leaving the apartment complex. As the Court of Appeals understood, the general rule is that a trial judge may not reject a referee's finding unless the finding is "clearly erroneous." Minn.R.Civ.P. 53.05(2). The Court of Appeals concluded that the referee, who had not made a specific finding on the point, did not clearly err in any of his findings and that there was no support in the record for the trial court's additional finding.

Since the referee made no finding one way or the other on the subject, the trial court was free to make its own finding. Any other approach would improperly restrict the freedom of the trial judge to make findings on relevant matters on which the referee has not made findings. The issue on appeal then is not whether a different finding by the referee would have been clearly erroneous but whether the trial court's finding was clearly erroneous. The only evidence on the point was the officer's testimony. He testified that he was in a position to see any car leaving the complex and that he saw defendant's car "coming from the immediate area of the reported call" and "leaving the scene." In view of this testimony and related testimony, the trial court did not clearly err in finding that the officer saw the car leaving the complex.

In summary, we conclude that the trial court did not act improperly and that the state met its burden of establishing the validity of the stop. We therefore reverse the decision of the Court of Appeals and reinstate the decision of the trial court.

Reversed and judgment of trial court reinstated.