**Carl Richard WOLD,**
**Petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. C9–88–323.**

Supreme Court of Minnesota.

Oct. 14, 1988.

---

C. Paul Jones, State Public Defender, Susan J. Andrews, Asst. State Public Defender, St. Paul, for appellant.

Alan L. Mitchell, St. Louis Co. Atty., Charles P. Schumacher, Asst. Co. Atty., Duluth, for respondent.

## OPINION

KELLEY, Justice.

Appellant Carl Richard Wold appeals from an order denying his motion for post-conviction relief following his conviction of the first-degree murder of Harold Both on March 3, 1986, in Duluth, Minnesota. In seeking a new trial, appellant raises two principal issues.[1] First, he contends the trial court erred in failing to suppress evidence the state acquired following a "pat down" search, which, he claims violated his right to be free from an unreasonable search and seizure under the Fourth Amendment to the United States Constitution. Secondly, he asserts that the trial

1. Appellant was charged with two counts of first-degree murder. Count I alleged premeditated murder. Count II alleged murder while attempting to commit aggravated robbery. The jury found appellant guilty on both counts, but the trial court only imposed the mandatory life sentence on one. A post-conviction motion for a new trial based upon the alleged errors raised in this appeal was subsequently denied by the trial court. Technically, this appeal is from that order.

court erred when it admitted statements he made to police authorities following his arrest, because his then existing state of intoxication, when combined with his limited intelligence, precluded him from knowingly, intelligently, and voluntarily waiving the right provided him by the Fifth Amendment to the United States Constitution to be free from compulsory self incrimination. Our review of the record leads us to reject appellant's assertions and to affirm the trial court.

At approximately 11 p.m. on March 3, 1986, Officer Greeman of the Duluth Police Department responded to a call that a man was "down" on 1st Avenue East between 3rd and 4th Streets. Upon arrival at the scene, he found ambulance paramedics attending an elderly male who had been the apparent victim of a stabbing. The victim, later identified as Harold Both, appeared to have sustained not only multiple stab wounds but, as well, an evisceration consisting of bowel and intestine extruding several inches outside the skin. By that time Both had already sustained considerable loss of fresh blood, most of which saturated his clothing although some was also found on the adjacent ground.

Officer Greeman also observed two persons at the scene in addition to the victim and the attending paramedics. One of those individuals, later identified as Jeffrey Oates, was arguing with one of the paramedics, while the other, later identified as the appellant, stood near the paramedic who was attempting to render aid to the badly injured victim lying on the ground.

The attendant with whom Oates was arguing told Greeman that Oates had "tried to run." Greeman then handcuffed Oates, patted him down for weapons, and was in the process of walking Oates away from the scene when a second Duluth police squad car arrived containing Officer Renier who immediately commenced to assist Greeman. Greeman told Renier to "Go ahead and take care of the other fellow until we sort this out." At that time appellant did not appear to be attempting to leave the scene.

Upon his arrival at the scene, Renier observed that several things were simultaneously happening: the recumbent victim, bloody and apparently comatose, was being attended by a paramedic. Officer Greeman was involved in attempting to subdue Oates, and appellant appeared to be now shouting at one of the ambulance attendants. Renier ordered appellant to step to an adjacent wall after which Renier "patted him down." During the course of the "pat down" Renier found an empty black knife sheath inside the appellant's jacket pocket as well as papers soiled with what appeared to be fresh blood. He also noticed fresh blood on appellant's outer clothing. Appellant was then handcuffed, and shortly thereafter was taken by police squad car to the police department. There, before attempting to question him further, Duluth police detectives Hanson and Lyons read to appellant his Miranda rights. After appellant had acknowledged that he understood those rights, and after he had waived them, the two officers proceeded to question him. During the course of the interrogation, appellant admitted he had stabbed Both in the course of robbing him. He also advised the detectives that he had ·hidden the knife following the stabbing and drew for them a rough map which aided them in ultimately finding the murder weapon in a snow bank some distance from the scene. The statement was tape recorded and later, together with the knife and other evidence obtained as the result of it, was eventually admitted in evidence at appellant's trial.

I.

■ We first consider whether the detention and "pat down" of appellant at the scene of the crime violated the right afforded him by Amendment IV to the United States Constitution to be free from an unreasonable search and seizure. In commencing, we iterate once again that an appellate court's scope of review from a trial court order denying post-conviction relief is limited to ascertaining whether the record provides sufficient evidence to sustain the trial court's findings. Unless those findings are clearly erroneous, they

will not be reversed. Of course, in order to determine whether the findings are clearly erroneous, an appellate court will make an independent determination, on the basis of the facts found by the trial court, to ascertain whether the state has met its overall burden of proof to establish the accused's guilt beyond a reasonable doubt.[2] *State v. Kulseth,* 333 N.W.2d 635, 637 (Minn.1983).

The Fourth Amendment's proscription against unreasonable searches and seizures is designed "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *U.S. v. Martinez—Fuerte,* 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). Generally, search or seizure of an individual is not constitutionally permissible unless the officers making the search have an arrest warrant, search warrant or have probable cause to make an arrest. However, the federal courts have carved out an exception to that general rule which permits officers under certain circumstances to "stop and frisk" an individual "for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). Notwithstanding that exception, it is clear that not every such "pat down" search nor every resulting seizure will surmount the general constitutional bar. To come within the exception, the search or seizure must be founded upon some objective justification. That justification can be a "reasonable suspicion" entertained by a police officer based upon the officer's experience that criminal activity may be taking place and that the

individual with whom the officer is confronted may be armed and capable of immediately causing permanent harm. Obviously, whether that "reasonable suspicion" justifies the limited search is fact determinative. *See, e.g., Terry,* 392 U.S. at 30, 88 S.Ct. at 1884. Moreover, it is clear that the justification for the *Terry*-type stop does not automatically terminate upon completion of the crime. *See, e.g., U.S. v. Hensley,* 469 U.S. 221, 234, 105 S.Ct. 675, 683, 83 L.Ed.2d 604 (1985).

This court, as well, in analyzing whether a particular limited stop has been justified under the circumstances, has employed a similar analysis. Factors, among others, to be considered are (1) the particularity of the description, if any, of the offender; (2) the size or extent of the area in which the offender may be found as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in the area; (4) the known or possible direction of a person's flight, if any; (5) the observed activity of the person stopped; (6) knowledge or suspicion that the person stopped has been involved in criminality of the type presently under investigation. *See, e.g., Appelgate v. Commissioner of Public Safety,* 402 N.W.2d 106, 108 (Minn.1987). *See, also* 3 W. La-Fave, *Search & Seizure* § 9.3(d), at 460. Our court, as well as courts of other states, have recognized that in order to "freeze" the situation, the stop of a person present at the scene of a recently committed crime of violence may be permissible without trampling on the Fourth Amendment prohibition against unreasonable search and seizure. *Appelgate,* 402 N.W.2d at 108.[3] *See*

---

**2.** In this case, one trial court judge following the pretrial omnibus hearing made findings accompanied by an extensive memorandum discussing the issues raised in this appeal. The judge who presided at the trial and heard the post-conviction motion did not articulate specific findings in his order denying relief following the post-conviction hearings, but that judge did, in effect, adopt the original omnibus hearing findings with the observation that the subsequent trial evidence, which he had heard, provided "no reason to find any differently."

**3.** In *Appelgate,* in upholding a stop following a reported burglary as not violating the Fourth

Amendment, we relied on Professor LaFave stating:

> As Professor LaFave points out in his discussion of the issue, in a situation such as that presented to the police in this case 'experience has shown that when a victim or witness cannot name the offender his apprehension is unlikely unless he is rather promptly found in the immediate area.' * * * In such a situation 'the police must have some authority to freeze the situation. Indeed, even if the circumstances are such that no one person can be singled out as the probable offender, the police must sometimes be allowed to take

*also People v. Juarez,* 35 Cal.App.3d. 631, 110 Cal.Rptr. 865 (1973). Especially is such a stop deemed permissible where only a limited number of persons are present at the scene of a violent crime.

■ In the present case, within minutes of receiving the report of a crime, Officer Greeman alone, at 11 p.m., arrived at the scene. Upon arrival it was immediately obvious that a violent crime had recently occurred. The officer found a victim lying on the ground, covered with blood, and while unconscious, being attended by paramedics. An atmosphere of haste pervaded the scene. Paramedics were in a hurry to get the victim to a hospital. No weapon was immediately apparent. One bystander (Oates), at least, was engaged in a shouting match with, and clearly interfering with, the work of the paramedics. Though the record leaves some doubt as to the extent appellant was involved in that activity, it does clearly appear he was near them in such proximity that it cannot be said, in light of the general confusion surrounding the situation, that Officer Greeman's on site conclusion that both Oates and appellant should be detained to preserve the integrity of the scene until the true facts could be sorted out was unreasonable. Moreover, under the circumstances we cannot fault his conclusion that both of the individuals may have witnessed the crime, or that either or both might be potential suspects involved in the commission of this violent assault. The comatose state of the victim allowed neither Greeman nor the later arriving Officer Renier to secure from the victim the identity of his assailant. Under these circumstances we cannot conclude that the trial court's finding that the officers were justified in stopping the appellant for the purpose of questioning him to ascertain the extent of his knowledge of, or participation in, the stabbing was clearly erroneous.

Although facts and circumstances exist justifying a stop and temporary detention

as coming within the exception to the general rule, it does not necessarily follow that those same facts will always provide sufficient articulable reasons justifying a warrantless "pat down" search of a person found at a crime scene. In this instance, however, in the light of these same facts and circumstances, we likewise conclude that the finding of the trial court, that the "pat down" search also came within the exception to the general rule prohibiting warrantless search was not clearly erroneous.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court held that a police officer may conduct a reasonable search for weapons in a "pat down" only if the officer has an articulable factual basis for belief that the person stopped may be armed and dangerous. Those facts must be judged against an objective standard of whether "the facts available to the officer at the moment of the seizure or the search would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* at 22, 88 S.Ct. at 1880. Justice Harlan, in concurrence, as Professor LaFave notes, makes explicit what is implicit in the majority opinion, specifically that "the right to frisk must be immediate and automatic if the reason for the stop is, as here, an articulable suspicion of a crime of violence." 3 W. LaFave, *Search & Seizure,* § 9.4(a) at 506, *quoting Terry* 392 U.S. at 33, 88 S.Ct. at 1886. As Professor LaFave also observed, many courts "have been inclined to view the right to frisk as being automatic whenever the suspect has been stopped * * * (for) a type of crime for which the offender would likely be armed * * * includ[ing] such suspected offenses as robbery * * * assault with weapons, homicide * * *." 3 W. LaFave, *Search & Seizure,* § 9.4(a) at 506. Although in *State v. Payne,* 406 N.W.2d 511 (Minn.1987), we acknowledged that the right of officers to conduct a "frisk" search was not the automatic sequel of a valid stop, we did cite

some action intermediate to that of arrest and nonseizure activity.'
   * * * [T]here are 'cases where the number of persons about in the area is so small that a

stopping for investigation may be made without any description whatsoever.'
   *Id.* at 108 (citations omitted).

with approval Professor LaFave in sustaining the validity of a "pat down" search. *Id.* at 513. *See also, U.S. v. Oates,* 560 F.2d 45, 59 (2nd Cir.1977).

In the instant case, the ascertainable facts available to the officers at the time of the search including, among other factors, the time of day, the area, the scene, the condition of the victim, the absence of an observable weapon, the inability of the victim to identify his assailant, as well as other facts previously noted, support the conclusion of the omnibus hearing judge that the "pat down" search under the then existing circumstances did not infringe impermissibly on appellant's Fourth Amendment rights. Since it obviously was not clearly erroneous, we affirm the order denying appellant's motion for post-conviction relief from alleged erroneous admission of the knife sheath, the blood stained papers, and the bloody clothing—all found on appellant at the time of the search.

## II.

We next address appellant's contention that his state of self-induced inebriety at the time Officers Hanson and Lyons interrogated him at the police station combined with his alleged mental deficiency precluded the trial court's finding that his waiver of his Fifth Amendment right against self incrimination had been voluntarily and knowingly made.

Shortly after appellant arrived at the Duluth Police Department from the scene, Detectives Hanson and Lyons proceeded to interrogate him about his knowledge of the stabbing. Before doing so, however, they read to appellant his Miranda rights. Appellant orally acknowledged that he understood those rights, and, after doing so, waived them, whereupon the officers orally interrogated him about his knowledge of the incident. During the course of that questioning, he admitted to having been Both's assailant, and further admitted the stabbing of Both resulted from an attempt to rob him. He likewise furnished the officers directions to a snow bank located some distance from the scene wherein he had hidden the knife following the assault.

Subsequently a tape recorded statement containing those admissions was taken from appellant. Before commencing the tape recorded interrogation, the officers again, but this time on tape, discussed with appellant his Miranda rights. Again, as before, appellant agreed to proceed with the interrogation.

Appellant makes no assertion here that the officers improperly gave the Miranda warnings, nor does he dispute that at the time he stated that he "knew his rights." Ordinarily, when the state has established those two conditions, it has met its burden of establishing a knowing and voluntary waiver. *State v. Linder,* 268 N.W.2d 734, 735 (Minn.1978); *State v. Kulseth,* 333 N.W.2d 635, 637 (Minn.1983). Furthermore, normally, when, as here, a trial court has found that an accused's waiver of his Miranda rights was knowingly, intentionally, and voluntarily made, unless clearly erroneous the finding will not be reversed on appeal. *Kulseth,* 333 N.W. 2d at 637. But when, as here, an appellant advances the contention that credible evidence supports his claim that his waiver, in fact, was not knowingly or intelligently made, appellate courts will make further inquiry. In such case, they will employ a subjective factual inquiry to determine whether under the totality of the circumstances the waiver was valid. A waiver is only valid if it was the product of a free and deliberate choice and was made with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it. *Colorado v. Spring,* 479 U.S. 564, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987).

The omnibus hearing judge rejected the appellant's argument that his alleged mental deficiencies combined with his degree of intoxication made the waiver invalid. Before doing so, the judge heard the testimony of the officers that although appellant smelled as if he had been drinking, and, as well, gave some appearances of having been drinking, his appearance and behavior generally seemed to be essentially normal, and he exhibited no physiological effects of intoxication, such as staggering,

memory loss, unconsciousness, or drowsiness. The result of a breathalyzer test given minutes after the statement, provided a reading of .13, sufficient under Minn. Stat. § 169.121 to trigger misdemeanor prosecution under current law for driving under the influence, but not, of itself, sufficient to determine intoxication.[3] The omnibus hearing judge likewise had the opportunity of considering appellant's initial alibi fabrications relative to the assaults, and, therefore, also, to assess the sophistication of reasoning that went into the planning of them. So, too, did the omnibus hearing judge consider a transcript of the appellant's inculpatory tape recorded statement taken literally minutes before administration of the blood alcohol analysis test, and was able to note the clarity and reasonableness of appellant's answers to the questions put to him. The judge also considered assertions made by family members by affidavit that appellant had been intellectually "slow" all his life and had always had difficulty understanding matters of a complex nature. Those assertions had been advanced in support of a defense motion for a psychiatric examination of the appellant under Rule 20, Minnesota Rules of Criminal Procedure. The motion resulted in a court ordered psychiatric examination of appellant by a psychiatrist who had been furnished, as well, all documents, police reports, and affidavits bearing upon the two issues, to-wit: (1) whether appellant was "at the time of the commission of the crime laboring under such a defect of reason as not to know the nature of the act constituting the offense or that it was wrong" and (2) "whether * * * [appellant] is mentally ill so that his capacity to understand the proceedings against him is diminished and is unable to proceed in his defense." The report of the consequent psychiatric analysis and conclusions opining that appellant was competent to understand the proceedings and stand trial was likewise available to the omnibus hearing judge before the finding was made that appellant's waiver was intelligently, knowingly, and voluntarily made.

Our review of those existing circumstances leaves us unable to find clearly erroneous the omnibus hearing court's finding that neither alone, nor in combination, did appellant's reduced intellectual capacity and/or his degree of intoxication vitiate appellant's waiver of his Fifth Amendment rights. *See, e.g. State v. Kulseth,* 333 N.W.2d 635 (Minn.1983); *Jankord v. State,* 290 Minn. 168, 186 N.W.2d 530 (1971).

The post-conviction judge, who was also the trial judge, in addition to having had the benefit of the omnibus hearing order and the evidence supporting it, also had the benefit of not only the trial testimony which he personally had heard, but additionally other materials submitted in support of appellant's post-conviction motion. As previously indicated, by stating that he could " * * * see no reason to find any differently than the judge at the omnibus hearing," the post-conviction judge essentially adopted those omnibus hearing order findings as supportive of the order denying the post-conviction motion.

Trial evidence heard by the post-conviction judge included testimony from witnesses who had observed the extent of appellant's drinking, and its physical manifestation upon the physiological conduct of the appellant before, at the time of, and shortly after the assault. It appears to us that the testimony of these witnesses generally corroborates the observations relative thereto related at the omnibus hearing by the police officers. In addition to being able to analyze the transcript of the tape recorded statement session, as had the omnibus hearing judge, the post-conviction judge also observed appellant who at trial testified from the witness stand on his own behalf. (We note that appellant's trial testimony did not deny any material fact contained in the statement, admitted that he attempted to rob Both, and that he had stabbed Both). Moreover, from trial evi-

---

**3.** Until as late as 1967, unless other facts demonstrated intoxication, it was not even illegal to drive or operate a motor vehicle in Minnesota with a blood alcohol concentration of less than .15 percent. *See, e.g.,* 1967 Minn.Laws, 1147, 1148 ch. 569.

dence, the post-conviction judge was aware that during the police station investigation, appellant had been afforded the opportunity to, and did, talk to his mother and girl friend, to each of whom he confessed the killing.

Three days before trial appellant was tested by a psychologist who did testify later at the trial. The result of the psychological testing revealed appellant to be at the low range of the intelligent quotient scale, although the psychologist did opine that due to the imminence of trial commencement, appellant experienced some difficulty concentrating on the test and, therefore, the "results should be considered an underestimate of his intellectual ability."

Thus, the post-conviction judge had the opportunity to assess the demeanor and weigh the testimony of all the lay witnesses who testified on the issue of intoxication —including the appellant. Likewise, the court personally was able to assess the intellectual capacity of appellant from appellant's answers to questions given in both the statement and when testifying from the stand in court. That judge was able to evaluate the conclusions of the psychologist who testified at trial and gave testimony which was somewhat equivocal. Merely because an accused exhibits equivocal signs of borderline mental deficiency, or may even be suffering from a mental illness at the precise time of the waiver, those facts alone may not automatically mandate a finding of incompetence to waive. *See, e.g., State v. Hoffman,* 328 N.W.2d 709 (Minn.1982).

Two trial judges, both experienced and fully appreciative of the scope of appellant's constitutional rights and the state's burden of proof to establish waiver, after considering all the facts and circumstances, concluded appellant had knowingly, intentionally, and voluntarily waived his Fifth Amendment right against self-incrimination. From our review of the entire record of the omnibus hearing, the trial, and the post-conviction proceeding, that conclusion appears to be not clearly erroneous. Therefore, we affirm.