CITY OF ST. PAUL, Respondent,

v.

**Stephen Drew UBER, Appellant.**

**No. C6-89-855.**

Court of Appeals of Minnesota.

Jan. 23, 1990.

Review Denied March 22, 1990.

Hubert H. Humphrey, III, Atty. Gen., Edward P. Starr, City Atty., Glenn Oliver, Asst. City Atty., St. Paul, for respondent.

William G. Moore, Moore, Halsey & Eskola, Fridley, for appellant.

Considered and decided by SHORT, P.J., and RANDALL and STONE,* JJ., without oral argument.

## OPINION

RANDALL, Judge.

Appellant Stephen D. Uber was arrested on January 31, 1989, at 2:52 a.m. near the intersection of Mackubin Street and University Avenue in St. Paul. Appellant was charged with driving after revocation and driving with an expired license. He filed a pretrial motion contesting the validity of the stop that led to his arrest. The trial court upheld the validity of the stop and found appellant guilty of the charges. Because we conclude the stop of appellant's vehicle violated the fourth amendment, we reverse.

## FACTS

Appellant's pickup truck was stopped by Officer David Mathison on January 31, 1989. Following the stop, Mathison ascertained that appellant's driver's license was revoked and expired.

At the time, Mathison had been employed as a police officer for approximately 18 months and was assisting the vice unit of the St. Paul Police Department. He first observed appellant at approximately 2:15 a.m. on January 31st when appellant was driving near the intersection of Kent Street and Charles Avenue in St. Paul. At that time, Mathison was working on another stop. Mathison next saw appellant at approximately 2:45 a.m. when he observed appellant's vehicle make a left turn from University and proceed northbound on Mackubin. Mathison testified that he knew it

was the same truck because he recognized the driver. Mathison radioed in the license plate numbers and learned that the vehicle was registered to a person in Moundsview, Minnesota, a metro suburb located aproximately 20 miles northwest of St. Paul. Upon learning that the vehicle was registered to someone in Moundsview, Mathison decided to stop appellant's pickup.

On cross-examination, Mathison conceded that he did not observe appellant exhibit any erratic driving behavior or engage in any illegal activity. Mathison also admitted that he did not have any outside information that appellant was suspected of involvement in any criminal activity. The officer testified that appellant was traveling around the posted speed at all times. Mathison did not observe appellant circle the block, make a stop, or pick up anyone. Appellant did not slow down, stop his vehicle, or engage in conversation with anyone who might be a prostitute. Also, at the time appellant's vehicle was stopped, there is no evidence that any known or suspected prostitutes were near the vehicle. Nevertheless, upon ascertaining that appellant's vehicle was registered to a Moundsview address, the officer made a decision to stop the vehicle because he thought appellant was engaging in suspicious criminal activity relative to prostitution.

Mathison testified that the Summit–University area is well-known as an area in which prostitution flourishes. Therefore, Mathison stated:

> [V]ehicles that do not normally belong in the area are stopped, driving privileges are checked, and we inquire as to why they are in the area.

Officer Mathison testified that certain characteristics are typical of persons looking for prostitutes. These include:

> [O]ne person in a [vehicle], the time of day, how often a vehicle is seen in the area, if it stops frequently, and if it picks up anybody.

The trial court upheld the validity of the stop, accepting Mathison's description of

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

appellant as fitting within the profile of a person looking for prostitutes. The trial court found that appellant was traveling alone, had been seen in the area twice within a 30–minute period, and was in the area at a late hour, 2:52 a.m. The trial court found that these characteristics, along with appellant's out-of-the-area address, provided adequate justification for the stop of appellant's vehicle.

The case was tried to the court with the prosecution and defense counsel agreeing to stipulated facts. The parties agreed that appellant's driver's license was revoked and expired at the time of the stop, but that the arresting officer did not know that prior to the stop, and thus the conviction purely lies or falls on whether the stop was permissible. If appellant's pretrial motion to suppress the evidence because of an impermissible stop should have been granted, the conviction must be vacated and the case against appellant dismissed. If the stop was permissible because the officer had articulable and particularized suspicion of criminal activity, appellant's conviction for a driver's license violation stands.

## ISSUE

Did the trial court err by concluding that the stop of appellant's vehicle was valid?

## ANALYSIS

Application of constitutional law to the existing facts mandates a reversal in favor of appellant. The constitutionality of the stop in this case depends entirely on the testimony of Officer Mathison. Appellant's testimony was that he was driving in the area to pick up his roommate from a friend's house. He testified that he was not familiar with the area, knew that the friend lived on Sherburne Avenue, but was not sure of the exact address. He testified that he was cruising in the general area and he was stopped while looking for his roommate's car.

We do not rest our decision on appellant's version of the facts, as that would be a credibility and believability issue for the trial court. For purposes of this analysis, we will disregard appellant's explanation, as if he had never testified, and assume that every observable fact testified to by the officer is true.[1] Even with that assumption, we find the objective facts articulated by the officer to be de minimis, and beneath constitutional standards.

■■■ The officer's observations are not in dispute, and have been reported near verbatim in this opinion. The trial court in its findings correctly noted the officer's observations as being: one person in the vehicle; early morning hours—2:30—3:00 a.m.; the vehicle being seen twice in the same general area within approximately 30 minutes; and a license plate check revealing registration to a person with a Moundsview address. The trial court accepted the officer's allegation that these facts were similar to characteristics typical of customers frequenting prostitutes in the Summit–University area of St. Paul. Thus, we must examine the constitutional validity of "profile stops." These stops generally involve a series of individual acts which are innocent and unrelated to criminal activity when examined separately, but which may form the basis for a reasonable suspicion of criminal activity when taken together. A "profile stop" (as with any vehicle stop based on suspicion of criminal activity) must conform to the constitutional protections afforded citizens by the fourth amendment[2] of the Bill of Rights.

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

---

1. Since the essential facts are not in dispute and the trial court accepted the officer's testimony for purposes of its analysis, the scope of appellate review is de novo. Our duty is to determine whether the officer's observations provided an adequate basis for the stop as a matter of law. *Berge v. Commissioner of Public Safety*, 374 N.W.2d 730, 732, (Minn.1985).

2. U.S. Const. amend. IV provides:

An investigatory stop may be undertaken without violating the fourth amendment, "if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot * * *." *United States v. Sokolow,* — U.S. —, —, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968)). The officer must have a "particular and objective basis for suspecting the particular person stopped of criminal activity."[3] *State v. Johnson,* 444 N.W.2d 824, 825 (Minn. 1989) (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981)). *Sokolow* was a valid profile stop, and thus serves as a guide.

In *Sokolow,* the United States Supreme Court upheld the validity of a stop that resulted in a seizure of a large quantity of cocaine outside the Honolulu International Airport. The Drug Enforcement Administration (DEA) agents who made the stop in Honolulu knew *before the stop* that Sokolow: (1) paid $2100 for two airplane tickets from a large roll of $20 bills; (2) traveled under a name that did not match the name under which his telephone number was listed; (3) traveled to Miami, a source city for illicit drugs; (4) remained in Miami for only 48 hours; (5) appeared nervous during his trip; (6) checked none of his luggage; and (7) dressed in a black jumpsuit and wore gold jewelry. *Sokolow,* — U.S. at —, 109 S.Ct. at 1583.

The Court held that these factors "taken together * * * amount to reasonable suspicion," even though, standing alone, each individual act is "quite consistent with innocent travel." *Id.* at —, 109 S.Ct. at 1586. The Court reasoned that paying $2100 from a roll of $20 bills containing nearly $4000 is quite "out of the ordinary." *Id.* Also, the fact that Sokolow was traveling under an alias "was sufficient to warrant consideration." *Id.* Furthermore, the Court concluded, a trip from Honolulu to Miami, which involves 20 hours of travel, for a 48–hour stay in Miami qualified as suspicious behavior. *Id.*

In this case, the observable facts taken together do not approach the composite bundle available to the DEA in *Sokolow.*[4] Appellant was driving alone, but in an area which is a main artery between Minneapolis and St. Paul, an area where after hours drivers can expect to find all night gas stations, fast food places, twenty-four hour superettes, and an area of light industrial, retail/commercial activity, and literally thousands of residents. The Minneapolis/St. Paul metropolitan area is home to dozens of businesses with hundreds of manufacturing and service-type jobs that routinely employ late and midnight shifts. Any professional person working late, any

---

3. The record is not clear what specific criminal activity appellant was suspected of as he drove his vehicle. The record does not disclose whether the officer claimed he observed objective and particularized facts that led to a belief appellant was a pimp, or facts that led to a belief that appellant was illegally propositioning a prostitute for sexual favors in return for compensation. If the officer concluded that appellant, while driving down a public street, and although not stopping to talk to a prostitute or even slowing down to approach one, was "thinking in his own mind" that he *might* stop and proposition a prostitute *if* he saw one, then the stop was based purely on the officer speculating that appellant was thinking of a crime, and therefore was improper as auto stops must be based on particularized and objective observable facts. *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). It is not criminal activity to be driving properly down a public street and muse or turn over in your own mind the possibility that if you saw a prostitute you might stop.

4. The facts are, instead, similar to, and of even *less weight* than those found insufficient to justify a "profile stop" in *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). The facts relied on in *Reid* were: (1) defendant arrived in Georgia from Fort Lauderdale, a source city for cocaine; (2) defendant arrived in the early morning hours; (3) defendant appeared to be trying to conceal the fact that he was traveling with someone; and (4) neither the defendant nor his companion had any luggage other than shoulder bags. These facts were held insufficient to support an investigatory stop. The Court reasoned that other than the manner in which the defendant and his companion walked through the airport, the facts relied on to justify the stop "describe a very large category of presumably innocent travelers who would be subject to virtually random seizures," if the stop were upheld. *Id.* at 441, 100 S.Ct. at 2754.

person associated with custodial or maintenance work in a metro office building, manufacturing shift workers, late night personnel such as police officers, firefighters, taxicab drivers, et cetera, et cetera, who live to the north or south of University Avenue in one of the many suburbs surrounding the Twin Cities, as appellant did, could easily find themselves in the vicinity of University Avenue after midnight looking for a particular business or residential address and not finding it on the first try. Standing alone, the fact that appellant was by himself in a vehicle in the general area of University Avenue after midnight is virtually meaningless.[5]

The next observable fact is that appellant was seen twice, but only twice, in the same general area within a 30–minute time span. The arresting officer conceded that appellant was not seen circling the same block, was not observed stopping or slowing down in the vicinity of any known prostitutes, did not attempt to engage anyone in conversation, and, as stated above, testified that no erratic driving behavior of any kind nor any evasive activity was observed.

Relative to "evasive action" serving as the basis for this traffic stop, we note that the City of St. Paul did not file a brief, but we examine the supreme court's recent *Johnson* decision for guidance. There the driving behavior was characterized as evasive by a state trooper. The trooper was in a crossover preparing to turn south on Highway 65 when he made eye contact with the driver of a red pickup truck. The driver immediately turned off of the highway and onto a side road. When the trooper pulled over to assist an apparently disabled car parked on the shoulder of the road, the red pickup truck emerged from the side road and turned back onto the highway. From this behavior, the trooper inferred that the driver of the truck pulled off of the highway for the purpose of avoiding the trooper. Therefore, the trooper became suspicious and stopped the vehicle. *Johnson*, 444 N.W.2d at 825.

The court concluded that this driving behavior "reasonably caused the officer to suspect that the defendant was deliberately trying to evade him," and provided "a particular and objective basis for suspecting the defendant of wrongdoing * * *." *Id.* at 827. Consequently, the stop complied with the requirements of the fourth amendment and the evidence obtained subsequent to the stop was admissible.

Acknowledging that the observable facts leading to the stop in *Johnson* were thin, the supreme court finished the opinion with the warning:

> Our decision, of course, should not be interpreted in any way as making it easier for police to justify stopping motor vehicles.

*Johnson*, 444 N.W.2d at 827. To justify the stop, the supreme court had to rest its decision on its key finding that Johnson *had engaged in evasive driving action* after observing the state trooper. The record here is devoid of any finding of evasive action and devoid of any testimony which would support such a finding.

Thus, the heart of our analysis rests, as the officer so testified, upon the fact that appellant's vehicle was registered[6] to a person in Moundsview, a metropolitan suburb of the Twin Cities. It is significant that the officer did nothing based on appellant's driving conduct. It is not until he ran a radio check of appellant's license

---

5. The facts have no relationship to *Applegate v. Commissioner of Public Safety,* 402 N.W.2d 106 (Minn.1987), wherein Applegate's vehicle was stopped by police in the area of a recently reported burglary after the officer observed his vehicle coming from the apartment complex where the burglarized apartment was located, just a few minutes after the burglary, in an area of very limited traffic.

6. Even this observable fact is weak. There can be considerable lag time between the date a vehicle is sold or otherwise transferred and the new owner re-registers the vehicle at his or her address. There is also lag time when the owner of a vehicle changes address and does not immediately inform the state driver's license department. All the registration on January 31, 1989, proves is that on that date the truck was *registered* to a person in Moundsview. It does not, by itself, prove that the owner actually lived in Moundsview on that date.

plate and found out that the vehicle was registered to a person in Moundsview that he acted. In the officer's mind that completed the "profile" of a male adult from out of the Summit–University area coming there to look for a prostitute.

We know of no authority that requires a resident of the State of Minnesota to have any reason to be on the public streets of another town as long as that person does not breach the peace or in any other way engage in improper behavior. No one from any suburb needs to justify his or her lawful presence on a public street in Minneapolis or St. Paul, or for that matter, on the public street of any other town. There simply needs to be something more than driving your own car in a proper and legitimate manner on the public streets of a town "other than the.one you live in" before the authorities can stop citizens.

What we do find is the officer's assumption that appellant was seeking prostitution, upon learning that appellant's vehicle was licensed to a resident of Moundsview, to be an inadvertent, but nevertheless invidious, form of discrimination.

We would not tolerate the blatant discriminatory proposition that any member of a minority group found on a public street in Edina[7] after midnight had better live there, or be required to stop and justify his or her presence to the authorities. Yet, we have a similar proposition here. Moundsview is a predominately white suburb, as are all of the suburbs ringing Minneapolis and St. Paul. The Summit–University area is a mixed neighborhood containing Caucasians and people of color.

Once we clear away the smoke from this case, it is clear that the stop of appellant, which only took place after his probable residence was ascertained, is premised on the belief that after midnight, Caucasian males from the suburbs are only in the Summit–University area for no good, and that after midnight, no good is all the Summit–University area has to offer. Neither the residents of Moundsview nor the residents of Summit–University deserve the implications of this case. It may be true that Summit–University has a higher incidence of prostitution than Moundsview, but simply being on a public street in an area where one "might" find a prostitute or a drug dealer does not, *without more*, meet any constitutional standard for a stop by the authorities. *See, e.g., Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979) (defendant's presence in a neighborhood frequented by drug users held insufficient to justify stop); 3 W. Lafave, *Search and Seizure*, § 9.3(c) at 457–58 (2d ed. 1987) ("[S]imply being about in a high-crime area should not of itself ever be viewed as a sufficient basis to make an investigative stop.") (footnote omitted). Similarly, the fact that one is a stranger in an area does not, standing alone, justify stopping that individual. W. Lafave, *supra*, at 453.

An objective analysis of the facts and the arresting officer's honest testimony and answers to questions on cross-examination leads only to the inescapable conclusion at which we arrive. Like the United States Supreme Court in *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65

---

7. The proposition that a white person in a black area becomes, without more, suspect to the authorities has the reverse but still disturbing resemblance to the chilling reasoning behind a 1930's ordinance in Palm Beach, Florida, a private enclave on the east coast whose name is synonymous with wealth. Palm Beach required domestics and service people working in the town to carry identity cards, be photographed, and fingerprinted.

In 1985 the practice came to light and was brought to national attention by a satirical cartoon in Gary Trudeau's syndicated strip "Doonesbury." A federal district court struck down the ordinance and the Florida state legislature outlawed the practice, claiming it was

reminiscent of South African Apartheid rules. A Florida state representative said of the ordinance, "It violates the right to privacy, the right to work, and the right to travel freely." The perplexed Palm Beach police, in defending the ordinance, explained that it had much use when comparing the fingerprints on file to exclude suspects of burglaries, and also was used to locate missing people and find wanted criminals. Barber, *Palm Beach's Pass Laws*, Maclean's, July 14, 1986, at 6a.

It is interesting that the regulation applied only to domestics and workers coming into Palm Beach to work, but not residents. Evidently residents of Palm Beach themselves were never missing or suspected of anything.

L.Ed.2d 890 (1980), we cannot sustain what was, in effect, a random stop.

On these facts, we decline to lower the present threshold justifying police stops of private citizens.

## DECISION

The stop of appellant's vehicle was not based upon reasonable articulable suspicion of criminal activity; thus the evidence obtained from the stop must be suppressed; and appellant's conviction for driving with an expired and revoked license must be vacated.

Reversed.

SHORT, Judge (concurring specially).

I concur in the majority opinion only insofar as it concluded that the arresting officer did not have a reasonable suspicion supported by articulable facts that appellant was engaging in criminal activity.