*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1273**

State of Minnesota,
Respondent,

vs.

Darreon Jonye Harding,
Appellant.

**Filed July 7, 2014
Affirmed
Hooten, Judge**

Ramsey County District Court
File No. 62-CR-12-9558

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John Choi, Ramsey County Attorney, Adam E. Petras, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Christopher L. Mishek, Certified Student Attorney, Jennifer Workman Jesness, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Hooten, Presiding Judge; Worke, Judge; and Toussaint, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**HOOTEN**, Judge

Appellant challenges the district court's pretrial ruling denying his motion to suppress evidence, arguing that officers lacked reasonable suspicion to conduct an investigatory stop. We affirm.

**FACTS**

In the early morning hours of December 2, 2012, Officer Daniel Michener of the St. Paul Police Department and his partner were responding to a welfare-check call mid-block on Geranium Avenue, just east of the intersection of Geranium and Arkwright Avenues. At approximately 12:54 a.m., Officer Michener thought he heard five or six gunshots from the southwest about one-half block to a block away. He ran west on Geranium while broadcasting a shots-fired call over his radio, announcing that they "had shots fired in the area very close to [them]."

When he arrived at the intersection of Geranium and Arkwright, Officer Michener looked south, but didn't see anything. He then looked north and saw one person lying on the ground with a group of over 30 others nearby.[1] He estimated that five to ten seconds had elapsed after hearing the shots and seeing the group. Within seconds of making the shots-fired call, Officer Michener observed that "people were walking north on Arkwright back toward SuperAmerica or Maryland Avenue" and radioed that multiple people were "leaving the area north or in all directions." The SuperAmerica is two

---

[1] Within seconds after the shots were fired, the person lying on the ground then got up unharmed.

blocks north of the intersection of Geranium and Arkwright, located at the intersection of Arkwright and Maryland Avenues.

Officer Richard Beard of the St. Paul Police Department and his partner were patrolling the area in a marked squad car when Officer Beard heard an officer broadcast that eight gunshots were fired "in the area of the SuperAmerica" or "in the area of Arkwright and Maryland . . . near the SuperAmerica." Officer Beard and his partner were about one-half block north of Maryland on Westminster Street and about one-and-a-half blocks away from the SuperAmerica.

Officer Beard estimated that it took him and his partner 10 to 15 seconds to drive south on Westminster and turn east on Maryland, heading toward the SuperAmerica. As soon as they turned, Officer Beard observed a group of four males—including appellant Darreon Harding—walking westbound toward them on the south side of Maryland. The group was a little more than one-half block west of the SuperAmerica. Some of the members of the group had food and drinks in their hands as if they had been coming from the SuperAmerica, but Officer Beard could not recall whether Harding had anything in his hands. The individuals were the only people on Maryland between Westminster and the SuperAmerica.

Officer Beard and his partner pulled over, exited the squad car, drew their guns, and commanded the group to lie down on the sidewalk. Officer Beard had safety concerns: "Shots were fired. We wanted to make sure that . . . if one or more in their group had a weapon, that they would not reach for it and they would not harm myself or my partner."

3

None of the individuals fled, and Officer Beard observed that they appeared to be "caught off guard when [the officers] pulled up next to them. The individuals were all stopped when [Officer Beard and his partner] got out of the vehicle," and they cooperated with the officers' commands. Officer Beard and his partner handcuffed each person, starting with Harding, so that they could search for weapons.

As Officer Beard handcuffed him, Harding stated, "I want to let you know that I have a BB gun in my pocket." Officer Beard then retrieved a BB gun from Harding's left front jacket pocket. After running Harding's name on his computer, Officer Beard learned that Harding had an outstanding warrant in Kentucky. He arrested Harding, and Harding was charged with one count of possession of a firearm by an ineligible person in violation of Minn. Stat. § 609.165, subd. 1b(a) (2012).

Harding moved to suppress the BB gun, arguing that Officer Beard lacked reasonable suspicion to stop him. In response to a question regarding whether he believed that the individuals in the group were involved in criminal activity, Officer Beard answered, "Based on the shots fired information coming from another officer, the proximity and the location, how close they were to the call, and . . . the group of the four that were walking away from that area, that's what we were using." Officer Beard also stated that there was "a large group of roving juveniles and males all night long."

The district court denied Harding's motion to suppress, stating that "a shots-fired incident . . . had just occurred a few moments earlier," a "very short period of time had elapsed from the broadcast of multiple shots fired until Officer Beard observed and stopped defendant near the scene of the suspected criminal activity," and "[i]t was shortly

4

after midnight on December the 2nd 2012." "Based on the totality of the circumstances," the district court concluded that Officer Beard "was justified in making a limited investigative stop of [Harding] in order to freeze the situation."

Harding waived his right to a jury trial and proceeded under Minn. R. Crim. P. 26.01, subd. 4. The district court found appellant guilty and sentenced him to, among other things, 60 months' imprisonment, stayed, and placed appellant on probation.

This appeal follows.

## D E C I S I O N

Because the parties do not dispute the facts,[2] we review de novo the district court's conclusion that an investigatory stop was based on a reasonable articulable suspicion. *State v. Yang*, 774 N.W.2d 539, 551 (Minn. 2009). We analyze the police officers' testimony and determine whether their observations provided an adequate basis for the stop. *Id.* "[C]onsiderable discretion will be given to an officer's decision to conduct an investigatory stop . . . ." *State v. Waddell*, 655 N.W.2d 803, 810 (Minn. 2003).

The Fourth Amendment of the United States Constitution and article I, section 10 of the Minnesota Constitution guarantee the "right of the people to be secure in their

---

[2] We recognize that Officer Beard's testimony regarding what he heard over the radio differs somewhat from that which Officer Michener observed and broadcasted. But "searches based on honest, reasonable mistakes of fact are unobjectionable under the Fourth Amendment." *State v. Licari*, 659 N.W.2d 243, 254 (Minn. 2003). And "in order to satisfy the reasonableness requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable." *Illinois v. Rodriguez*, 497 U.S. 177, 185, 110 S. Ct. 2793, 2800 (1990) (quotation marks omitted). Thus, despite these differences, we examine whether Officer Beard was reasonable in conducting the stop based on the information that he heard over the radio.

5

persons, houses, papers, and effects against unreasonable searches and seizures." "Generally, a search or seizure of an individual is not constitutionally permissible unless the officers making the search have an arrest warrant, search warrant or have probable cause to make an arrest." *Wold v. State*, 430 N.W.2d 171, 174 (Minn. 1988). But an officer may, "under certain circumstances[,] . . . 'stop and frisk' an individual 'for purposes of investigating possible criminal behavior.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 22, 88 S. Ct. 1868, 1880 (1968)). In order to stop and frisk an individual, an officer must have some objective justification. *Id.* That justification must be, at a minimum, an officer's reasonable suspicion that criminal activity may be taking place and that the individual may be armed and dangerous. *Id.*

Reasonable suspicion exists if "the police officer [is] able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S. Ct. at 1880. The reasonable-suspicion standard is not high, but it requires more than a hunch. *State v. Diede*, 795 N.W.2d 836, 843 (Minn. 2011). It is "an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Terry*, 392 U.S. at 21–22, 88 S. Ct. at 1880. Put another way, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27, 88 S. Ct. at 1883.

6

"[T]he stop of a person present at the scene of a recently committed crime of violence may be permissible without trampling on the Fourth Amendment prohibition against unreasonable search and seizure." *Wold*, 430 N.W.2d at 174. In these situations, "the police must have some authority to freeze the situation." *Id.* at 174 n.3 (quoting 3 Wayne LaFave, *Search and Seizure* § 9.3(d) (2nd ed. 1987)). "[E]xperience has shown that when a victim or witness cannot name the offender his apprehension is unlikely unless he is rather promptly found in the immediate area." *Id.* (quoting LaFave, *supra*, § 9.3(d) (2nd ed. 1987)).

We consider the following nonexclusive factors, known as the *Appelgate* factors, when determining whether an officer has reasonable suspicion supporting a stop near the scene of a recently committed crime: (1) the particularity of the offender's description; (2) the size of the area in which the offender might be found, as indicated by the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the person stopped; and (6) knowledge or suspicion that the person stopped has been involved in other criminality of the type under investigation. *Id.* at 174; *see also Appelgate v. Comm'r of Pub. Safety*, 402 N.W.2d 106, 108 (Minn. 1987) (setting forth factors).

## 1. Description of the offender

The parties agree that Officer Beard did not have a description of the shooter. This factor weighs against a determination that Officer Beard had reasonable suspicion to conduct the investigatory stop of Harding.

But "[t]his fact should not put an end to the matter." *Appelgate*, 402 N.W.2d at 108 (upholding stop of a vehicle despite the absence of a description, noting that the vehicle left the scene of a recently reported burglary in an area with very little traffic and exhibited erratic driving behavior). "[A]n officer is not required to know that a person committed a crime in order to perform an investigatory stop." *Yang*, 774 N.W.2d at 551 (upholding stop of a vehicle despite the absence of a description, noting that the suspect's vehicle drove the wrong way out of an exit ramp without its headlights on just after shots were fired in the ramp).

## 2.      Size of area in which the offender might be found

"The elapsed time indicates the maximum distance it would be possible for the offender to have covered since the crime, and this in turn supplies the radius of the area in which he might be found." 4 Wayne R. LaFave, *Search and Seizure* § 9.5(h) (5th ed. 2012). The timing of events establishes that the size of the area in which the shooter could have been found is small. Officer Michener testified that only seconds had passed after he heard the shots and made the shots-fired broadcast. Officer Beard testified that less than 15 seconds elapsed between the time he heard the shots-fired broadcast and saw Harding. The record indicates that Officer Beard stopped Harding moments after first observing him within one-half block of the SuperAmerica.

Harding relies on *State v. Johnson*, 645 N.W.2d 505 (Minn. App. 2002), *Diede*, 795 N.W.2d at 836, and *Ybarra v. Illinois*, 444 U.S. 85, 100 S. Ct. 338 (1979), arguing that mere proximity to a reported crime is not enough to support reasonable suspicion. But these cases are distinguishable. None involve a recently committed shots-fired

8

incident and none examine the propriety of the police to freeze the scene within seconds of a recently committed crime of violence. Moreover, in this case, proximity, alone, did not justify the stop. This factor weighs strongly in favor of a determination that Officer Beard had reasonable suspicion to conduct the investigatory stop of Harding.

**3.     Number of persons about in the area**

"[E]ven if the circumstances are such that no one person can be singled out as the probable offender, the police must sometimes be allowed to take some action intermediate to that of arrest and nonseizure activity." *Appelgate*, 402 N.W.2d at 108 (quoting LaFave, *supra*, § 9.3(d) (2nd ed. 1987)). "[T]here are 'cases where the number of persons about in the area is so small that a stopping for investigation may be made without any description whatsoever.'" *Id.* (quoting LaFave, *supra*, § 9.3(d) (2nd ed. 1987)).

Officer Beard acknowledged that he knew that there was a group of juveniles or males present in the area that evening, and it is not clear from the record whether Officer Beard believed that Harding and his companions were the same group. But Officer Beard testified that Harding and the three others were the only people on Maryland between Westminster and the SuperAmerica. Officer Beard responded within seconds and saw only these individuals in close proximity to the area in which he believed that a shooting had just occurred. This factor weighs in favor of a determination that Officer Beard had reasonable suspicion to conduct the investigatory stop.

**4. Known or probable direction of the offender's flight**

"[C]ourts have quite properly stressed, in upholding the stopping of suspects upon rather general descriptions, that the police knew the direction in which they were thought to be going." LaFave, *supra*, § 9.5(h) (5th ed. 2012) (quotation omitted). Officer Beard had no information regarding possible flight. But Officer Beard observed Harding and the other individuals walking *away* from the SuperAmerica, which he believed to be the area of a recently committed shots-fired incident. This factor weighs slightly in favor of a determination that Officer Beard had reasonable suspicion to conduct the investigatory stop.

**5. Observed activity by the person stopped**

Another relevant factor is whether the individual exhibits "suspicious conduct." *Id.* "We are deferential to police officer training and experience and recognize that a trained officer can properly act on suspicion that would elude an untrained eye. It is also true that wholly lawful conduct might justify the suspicion that criminal activity is afoot." *State v. Britton*, 604 N.W.2d 84, 88–89 (Minn. 2009) (citation omitted). Officer Beard testified that he saw the individuals in the group holding food and drinks in their hands as though they had recently left the SuperAmerica. He also testified that they seemed surprised when they were stopped and were cooperative. Harding was not exhibiting suspicious conduct. This factor weighs against a determination that Officer Beard had reasonable suspicion to conduct an investigatory stop of Harding.

**6. Knowledge or suspicion of other criminality**

Officer Beard did not testify that he had knowledge or suspicion that Harding had been involved in other criminality. This factor weighs against a determination that Officer Beard had reasonable suspicion to conduct an investigatory stop.

**7. Other factors**

The time of the stop is a relevant consideration when determining whether an officer has reasonable suspicion to conduct an investigatory stop. *See Appelgate*, 402 N.W.2d at 109; *see also* LaFave, *supra*, 9.5(h) (5th ed. 2012) ("[T]he sufficiency of a certain description given the passage of a certain length of time in a certain area may well depend upon the time of day; less will suffice in the early morning hours when few persons are about than would be a basis for stopping at high noon."). Here, the stop occurred at approximately 1:00 a.m., supporting a determination that Officer Beard had reasonable suspicion to conduct an investigatory stop.

The police may also take into account the degree of potential danger being investigated. *United States v. Ramos*, 629 F.3d 60, 66–67 (1st Cir. 2010); *see also City of Indianapolis v. Edmond*, 531 U.S. 32, 44, 121 S. Ct. 447, 455 (2000) ("[T]he Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to thwart an imminent terrorist attack or to catch a dangerous criminal who is likely to flee by way of a particular route."). The circumstances, here, involve multiple shots from a firearm in an urban area in the middle of the night when there were numerous persons, including juveniles, walking in the vicinity and possibly in the zone of danger. Officer Beard's testimony establishes that he recognized the potential danger associated with

11

multiple discharges of a firearm under these circumstances. The gravity of danger to the public supports Officer Beard's investigatory stop.

In support of his argument, Harding relies on *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375 (2000), stating that "Officer Michener's broadcast over the police radio failed to give a description or probable location of a suspect that other officers could rely on" and "the Court refused to create a 'firearm' exception to *Terry*." In *J.L.*, the Supreme Court examined whether an anonymous tip reporting that a person is carrying a gun may justify a police officer's stop and frisk. 529 U.S. at 269–74, 120 S. Ct. at 1377–80. The Supreme Court concluded in the negative and declined to create a "firearm exception" to traditional *Terry*-stop analysis. *Id.* at 272–73, 120 S. Ct. at 1379–80.

*J.L.* is distinguishable. It largely addresses the propriety of a stop based on an anonymous tip that the person was carrying a gun. And the Supreme Court noted that the facts did not require it to speculate about the circumstances in which the danger alleged in the anonymous tip might be so great as to justify a search even without a showing of reliability. *Id.* at 273, 120 S. Ct. at 1380. The Supreme Court clarified, "We do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk." *Id.* at 273–74, 120 S. Ct. at 1380. Here, unlike the facts in *J.L.*, Officer Michener reported that multiple shots had been fired in an urban area, rather than someone merely possessing a firearm. Less than 30 seconds after Officer Beard heard the shots-fired broadcast in the early morning hours in December, he

12

encountered Harding, along with other persons, who were leaving the area from where the shots were reported to have been fired.

Under these circumstances, and based upon the broadcast information that he testified that he heard over the radio, Officer Beard reasonably believed that a crime had been committed and that his safety or that of others was in danger, thereby justifying an investigatory stop of Harding.  The district court did not err by denying Harding's motion to suppress.

**Affirmed.**