STATE of Minnesota, Respondent,

v.

Charles YANG, Appellant,

and

Charles Yang, petitioner, Appellant,

v.

State of Minnesota, Respondent.

Nos. A07–121, A08–1464.

Supreme Court of Minnesota.

Oct. 29, 2009.

See also, *State v. Vang,* 774 N.W.2d 566.

544

Lori Swanson, Attorney General, St. Paul, Minnesota; and Robert M.A. Johnson, Anoka County Attorney, Robert D. Goodell, Assistant Anoka County Attorney, Anoka, MN, for respondent.

Deborah K. Ellis, St. Paul, MN, for appellant.

## OPINION

DIETZEN, Justice.

Appellant Charles Yang was convicted of two counts of aiding and abetting first-degree premeditated murder and two counts of aiding and abetting first-degree premeditated murder for the benefit of a gang for the shooting and resulting deaths of Bunsean Lieng and Tashi Jagottsang. *See* Minn.Stat. §§ 609.05, 609.185(a)(1), 609.229, subd. 2 (2008). He was also convicted of four counts of aiding and abetting attempted first-degree premeditated murder and four counts of aiding and abetting attempted first-degree premeditated murder for the benefit of a gang for the shooting and resulting injuries sustained by Tenzin Tsondu, Tenzin Tenpa, Tenzin Choegyal, and Tenzin Phelgye Woser. *See* Minn.Stat. §§ 609.05, 609.17, 609.185(a)(1), 609.229, subd. 2 (2008). Appellant obtained a stay of his direct appeal and filed a petition for postconviction relief alleging ineffective assistance of trial counsel. The postconviction court summarily denied appellant's petition, and his motion for reconsideration and leave to amend his petition.

In this direct appeal, appellant argues that (1) there was no reasonable articulable suspicion to stop the vehicle in which he was a passenger; (2) Minn.Stat. § 609.229 (2004), the for-the-benefit-of-a-gang statute, is unconstitutional; (3) the district court improperly restricted cross-examination of informants and codefendants; (4) the district court erred in denying his motion to suppress gang-related evidence and testimony; (5) the jury instructions were improper and constituted structural error; (6) prosecutorial error during closing argument denied him a fair trial and the cumulative effect of the district court's errors requires a new trial; (7) there was insufficient evidence to support his convictions; (8) his multiple consecutive sentences unfairly exaggerated the criminality of his convictions; and (9) the postconviction court erred when it denied his petition without a hearing. We affirm.

About 10:00 p.m. on February 3, 2005, several police officers separately responded to calls that there was a fight at Jimmy's Pro Billiards (Jimmy's) in Columbia Heights and that gunshots had been fired.[1] Within seconds, Officer Sinn arrived at

---

1. We have decided another appeal arising from this incident, *State v. Vang*, 774 N.W.2d 566 (Minn.2009), which involved a separate trial. Because witness testimony varied slightly between the two trials, and because some witnesses were called in one trial and not another, there is a slight variation between the facts in *Vang* and this case.

Jimmy's and observed a body lying on the floor of a parking ramp. He heard gunshots fired in the ramp and seconds later observed a black four-door Honda-type vehicle exit the ramp through the entrance with its lights off. Officer Sinn radioed for other responding officers to stop the black four-door Honda-type vehicle.

Police officers stopped two Hondas leaving the area. The first was a dark-blue Honda Civic hatchback. Sai Vang was in the driver's seat, appellant was in the front passenger seat, and Grogan Yang was in the back seat. The police found a 9mm handgun and a .38 revolver under Sai Vang's seat and a .357 revolver under appellant's seat. Also, police stopped a black four-door Honda Accord in which Jason Moua was in the driver's seat, Helene Yang in the front passenger seat, and Meng Vang in the back seat. At the crime scene, police officers found Bunsean Lieng dead on the parking ramp floor, Tashi Jagottsang dead in a nearby park, and four other Tibetan men who had been shot during the incident.

During their investigation of an unrelated crime, police stopped a maroon Acura and recovered a 9mm handgun that ballistic testing traced to nine spent cartridge casings found in the alley behind Jimmy's and the bullet recovered from one of the injured victim's clothing. Other testing traced nine other casings found in the parking ramp to a 9mm handgun found in the snow about three blocks from Jimmy's.

Subsequently, appellant was indicted and charged with twelve felony counts arising out of the deaths of Bunsean Lieng and Tashi Jagottsang and the injuries sustained by the four other Tibetan men. Before trial, appellant brought a motion to suppress evidence obtained during the police stop of the car in which he was a passenger, and to limit the admissibility of gang-related testimony. The district court denied the motion to suppress, denied a portion of the motion to limit as it related to certain lay testimony and a CD referring to the MOD gang, and deferred the remainder of the motion until trial.

At trial, the jury was informed that appellant had stipulated to membership in the MOD gang. The State presented testimony regarding three incidents that led up to the shooting at Jimmy's. Several weeks before the incident, Jason Moua, a MOD gang member, and Lue Vang were attacked at a bowling alley by members of another gang and suffered injuries resulting in the hospitalization of Lue Vang. Subsequently, Lue Vang and Sai Vang went to a St. Paul hotel to visit Sai Vang's cousin from California. Appellant, Jason Moua, Grogan Yang, and other MOD gang members were also at the hotel. Lue Vang discussed the bowling alley incident with Jason Moua. Before leaving, Moua gave Sai Vang a loaded 9mm handgun. Sai Vang put the gun under the driver's seat of his dark-blue Honda Civic hatchback.

On the night of the incident appellant, Jason Moua, Grogan Yang, Meng Vang, Sai Vang, Helene Yang, and other MOD gang members attended a party given by Lue Vang. Sometime that evening, several of the group decided to go to Jimmy's and left in three cars. Jason Moua drove his black Honda Accord with passengers Helene Yang and Meng Vang. Sai Vang drove his dark-blue Honda Civic with passengers appellant and Grogan Yang. Yatua Her drove a maroon Acura with passengers Xee Lor and Fong Vang. Before they departed, Lue Vang, who knew that Jason Moua and Sai Vang were in a gang, told Sai Vang not to go looking for trouble.

At the same time, a group of Tibetan[2] men met at Jimmy's to play pool. After playing pool, five of them decided to leave for a club. Tenzin Choegyal, Tashi Jagottsang, and Jampa Ritzekura went to Jampa's car in the alley. While Sonam Tsering and Tenzin Sonam were walking toward the parking ramp, a brownish-red Honda occupied by three Asian males drove up. The occupants threw gang signs and yelled at Tsering and Sonam, "What do you claim?" Jampa told the Asians that the Tibetans were not in gangs. The Asians responded by saying they wanted to "kick his ass." Jampa replied, "we cool." After the vehicle left, a Honda Civic hatchback passed by the Tibetans, and its Asian occupants yelled, "What are you guys popping?" After the Asians parked their cars in the ramp, they yelled and swore at the Tibetans on their way into the pool hall.

Subsequently, Jampa called his brother, Khedup Ritzekura, and then met Jeremy Phoulom and his brother in the parking area. He told them about the incident in the parking area at Jimmy's. Following the arrival of Bunsean Lieng, and more discussion, the Tibetans went back into the pool hall to talk with the Asians. One witness testified that Bunsean Lieng brought a baseball bat into the pool hall that he waved to scare people.

Inside the pool hall, Jampa identified Grogan Yang as the individual who had harassed him. As Khedup and Bunsean Lieng approached Grogan Yang, appellant, Jason Moua, and Meng Vang came to Grogan's assistance. The Asians, holding pool sticks, surrounded Khedup and made gang signs. A fight erupted. Pool sticks and balls began to fly. The Tibetans fled the pool hall out the back door and into the

alley. Several of the Asians stood by the back door and shot at the Tibetans as they ran up the alley. Tashi Jagottsang was killed, and Tenzin Tsondu, Tenzin Tenpa, Tenzin Choegyal, and Tenzin Phelgye Woser were injured. Additional shots were fired in the parking ramp, and Bunsean Lieng was shot and killed.

Following his arrest, appellant admitted that he knew his friends at the pool hall were "strappin" (carrying weapons) because they always "pack[ed] something." He told police that there was usually a gun in each of the three cars, that guns were passed around to whoever was "riding" for the night, and that "a whole bunch of our guys [were] stomping on" the other group at the pool hall. Appellant stated that when he got to the pool hall fight, he "was thinking about which one [he] was going to hit."

Three federal prisoners, who were incarcerated with appellant, testified about his conversations with them. Lorenzo Brown testified that appellant stated that MOD gang members went to Jimmy's knowing there would be a rival gang present and that the MOD gang was looking for trouble. Brown stated that Yang said that he fired a shot at one of the Tibetans intending to kill him, that he shot the person in the back, and that he kept shooting after he saw the person fall. Eugene Clanton testified that appellant told him that after the Tibetans ran outside, he was the first to shoot. According to Clanton, appellant stated that he was sure he had shot someone in the back because he saw smoke. Clyde Minor testified that appellant told him that he had shot at the Tibetans and that he was sure he had shot someone in the back because he saw the person fall.

2. Although collectively referred to as "Tibetans," Bunsean "Dan" Lieng was Cambodian and Jeremy Phoulom is Laotian.

Sai Vang testified as part of a plea agreement. He stated that he saw Grogan Yang fire shots up the alley at the Tibetans, that appellant and Grogan Yang then ran to his car, and that appellant told him he fired several shots but did not know if he hit anyone. Also, the State introduced gang-related evidence and called numerous lay witnesses to testify about MOD. Sergeant Straka testified as a gang expert. Appellant waived his right to testify.

Appellant was found guilty of all twelve counts. He was sentenced to two life terms for aiding and abetting first-degree premeditated murder for the benefit of a gang, and four 186–month sentences for aiding and abetting attempted first-degree premeditated murder for the benefit of a gang, all to run consecutively. After obtaining a stay of his direct appeal in this court, appellant filed a petition for postconviction relief alleging ineffective assistance of trial counsel. The postconviction court summarily denied the motion without a hearing. Subsequently, appellant filed a motion for reconsideration and to amend his petition, both of which were also denied.

## I.

■ Appellant argues that the district court should have suppressed evidence found in the vehicle in which he was a passenger. The State counters that the vehicle stop was supported by a reasonable articulable suspicion. When the facts are not disputed, we review de novo the district court's conclusion that an investigatory stop is based on a reasonable articulable suspicion. *State v. Waddell,* 655 N.W.2d 803, 809 (Minn.2003). Further, appellate review requires that we analyze the testimony of officers and determine whether, as a matter of law, their observations provided an adequate basis for a stop. *Berge*

*v. Comm'r of Pub. Safety,* 374 N.W.2d 730, 732 (Minn.1985).

■ An investigatory stop of a vehicle is justified if police have a " 'particularized and objective basis for suspecting the particular person stopped of criminal activity.' " *State v. Pike,* 551 N.W.2d 919, 921 (Minn.1996) (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). We apply a totality-of-the-circumstances test to analyze the legality of vehicle stops near a recent crime scene. *Appelgate v. Comm'r of Pub. Safety,* 402 N.W.2d 106, 108 (Minn.1987) (citing 3 W. LaFave, *Search and Seizure* § 9.3(d), at 461 (2d ed.1987)).

■ Appellant contends that Officer Sinn had no basis to request responding officers to stop the black four-door Honda-type vehicle because it was not linked to any criminal activity. But an officer is not required to know that a person committed a crime in order to perform an investigatory stop. Considering the *Appelgate* factors, the officer observed only one vehicle exit the ramp just after shots were fired, and this vehicle suspiciously exited by driving the wrong direction with its lights off. We conclude that the officer had a reasonable articulable basis to suspect that the occupants of the vehicle had been involved in the shooting.

■ Appellant also argues that the dark-blue Honda Civic hatchback in which he was a passenger was only stopped because the occupants were Asian. "It is well-established that an investigatory stop may be based in part on a description of a suspect's race, but race or color alone is not a sufficient basis for making an investigatory stop." *State v. City of Mounds View,* 518 N.W.2d 567, 572 (Minn.1994) (upholding the stop of a vehicle that was being driven in a direction away from the scene of a recent armed robbery and

whose occupant's race and clothing matched the suspect's description).

After hearing Officer Sinn's radio communication, Officer Harvey saw only one vehicle, and it was driving in the direction that Officer Sinn had indicated. When the vehicle's occupants observed Officer Harvey in his squad car, the driver averted his eyes, the occupants began to talk rapidly and make furtive gestures, and the backseat passenger repeatedly looked back at the officer. We conclude that there was a reasonable articulable basis to stop the dark-blue Honda Civic that was not based solely on its occupants' race.

Finally, appellant argues that the dark-blue Honda Civic hatchback did not match the description given by Officer Sinn. It is not unreasonable for an officer to stop a vehicle that is "very similar in body style but slightly lighter in color." *Waddell*, 655 N.W.2d at 810 (upholding the stop of a gray vehicle although the crime vehicle had been described as dark blue or black). Here, the officer who stopped the hatchback testified that he thought the vehicle matched the description of the suspect vehicle. While a Honda Civic hatchback is different in size and style than a Honda Accord, both Hondas have somewhat similar shapes in comparison to other brands of vehicles. Thus, we conclude that the district court did not err in denying appellant's motion to suppress.

## II.

Appellant claims that Minn.Stat. § 609.229, the for-the-benefit-of-a-gang statute, is unconstitutionally broad and vague under the United States and Minnesota Constitutions. He argues that under the statute, gang members may be convicted for the crimes of other gang members just because they were in the vicinity of the crime.

We review challenges to the constitutionality of a statute de novo. *State v. Frazier*, 649 N.W.2d 828, 832 (Minn.2002). Statutes are presumed constitutional, and the challenging party must demonstrate beyond a reasonable doubt that they are unconstitutional. *Id.* Here, appellant has not met his burden of proof. He does nothing more than state his argument that the statute is unconstitutional. *See Schoepke v. Alexander Smith & Sons Carpet Co.*, 290 Minn. 518, 519–20, 187 N.W.2d 133, 135 (1971) ("An assignment of error based on mere assertion and not supported by any argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection.").

Appellant also argues that he was entitled to a bifurcated trial because the finding that a crime is committed for the benefit of a gang is a sentencing enhancer and not an element of the offense. The concurrence in *State v. Jackson*, 714 N.W.2d 681, 700 (Minn.2006) (Hanson, J., concurring), suggests this procedure, but we have never required it. We decline to do so in this case.

## III.

Appellant argues that his constitutional right to confront witnesses was violated when the district court, over his objection, prohibited defense counsel from questioning informants and his codefendants about the number of years or percentage of time by which their sentences were reduced for testifying in appellant's case.

We review a trial court's evidentiary rulings that result in an alleged violation of a defendant's right to confront witnesses for an abuse of discretion. *State v. Lanz–Terry*, 535 N.W.2d 635, 641 (Minn. 1995). If we conclude that a violation did

occur, we will review the error to determine if it was harmless beyond a reasonable doubt. *State v. Courtney*, 696 N.W.2d 73, 79 (Minn.2005). An error is harmless beyond a reasonable doubt "[i]f the verdict actually rendered [is] surely unattributable to the error." *State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997).

 Under the Confrontation Clause, a defendant has the right to cross-examine witnesses against him. *State v. Ferguson*, 742 N.W.2d 651, 656 (Minn. 2007). But "the Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *State v. Dobbins*, 725 N.W.2d 492, 505 (Minn.2006) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987)) (internal quotation marks omitted). "The Confrontation Clause is not violated by limitations on cross-examination so long as the jury is presented with sufficient information from which to appropriately draw inferences as to the witness's reliability." *Ferguson*, 742 N.W.2d at 657.

We have specifically upheld restrictions on cross-examining codefendants about the number of years that their sentences were reduced by pleading guilty. *Dobbins*, 725 N.W.2d at 505–06; *State v. DeVerney*, 592 N.W.2d 837, 845 (Minn.1999); *State v. Greenleaf*, 591 N.W.2d 488, 502 (Minn. 1999). In doing so, we considered whether the district court allowed cross-examination on other aspects of the plea agreement. *See Dobbins*, 725 N.W.2d at 505; *DeVerney*, 592 N.W.2d at 845; *Greenleaf*, 591 N.W.2d at 502.

Appellant makes two arguments. First, appellant argues that the court limited the cross-examination of the three jailhouse informants, Lorenzo Brown, Clyde Minor, and Eugene Clanton. But the defense questioned these informants about the deals they hoped to receive, and cross-examination was not limited.

Second, appellant argues that the court improperly limited the cross-examination of Xee Lor, Helene Yang, and Sai Vang, who testified as a condition of their plea agreements. Pursuant to the State's motion, the district court restricted the appellant from inquiring into the exact number of months or percentage of reduction of codefendants' sentences under their respective plea agreements. Xee Lor testified that he was charged with the same crimes as appellant, that he pleaded guilty to one count of second-degree murder, one count of second-degree assault, and one count of committing a crime for the benefit of a gang, that his sentence was 32 years, which was a "good deal" and considerably less jail time.

Helene Yang was originally charged with several counts of second-degree murder; in exchange for her testimony she was allowed to plead guilty to aiding an offender after the fact, and received a probationary sentence and one year in jail. Sai Vang was charged with the same crimes as appellant; in exchange for his testimony, he was allowed to plead guilty to aiding an offender after the fact, and a crime committed for the benefit of a gang. When asked if his sentence was a "pretty good deal," Sai Vang stated that he "wouldn't know."

We conclude that the jury had sufficient information about appellant's codefendants' plea agreements to assess their credibility and that the district court did not err in restricting cross-examination. The jury knew that the codefendants received considerably less jail time in exchange for their testimony. Thus, we conclude that the district court did not err in limiting the testimony.

Further, the court instructed the jury that it could not find appellant guilty based on Vang's accomplice testimony unless it was corroborated by someone other than an accomplice. Sai Vang's testimony was corroborated by numerous witnesses. Specifically, the events inside the pool hall, and Yang's admission when he entered the car after the shootings, were corroborated by other witnesses.

## IV.

Appellant argues that the district court erred in admitting gang evidence. He argues that the court abused its discretion when it allowed (1) Eugene Clanton to testify about the Rolling 60s gang, (2) MOD gang evidence and lay testimony about the MOD gang, and (3) gang expert testimony.

 We review evidentiary rulings for an abuse of discretion. *State v. Mahkuk*, 736 N.W.2d 675, 686 (Minn.2007). If testimony was erroneously admitted, we review for harmless error. *Id.* Because appellant does not raise constitutional errors with respect to the court's evidentiary rulings, "[r]eversal is warranted only [if] the error substantially influence[d] the jury's decision." *State v. DeShay*, 669 N.W.2d 878, 888 (Minn.2003).

Initially, appellant argues that because he stipulated he was a member of the MOD gang, gang evidence was not relevant. But appellant was charged with six counts involving crimes committed for the benefit of a gang, in violation of Minn.Stat. § 609.229, subd. 2 (2008). As part of this

offense, the State had the burden of proving that appellant committed a crime "for the benefit of, at the direction of, in association with, or motivated by involvement with a criminal gang"[3] and acted "with the intent to promote, further, or assist in criminal conduct by gang members." *Id.* Appellant did not stipulate that the MOD was a criminal gang or that he committed crimes for the benefit of a criminal gang. Thus, testimony on both topics was relevant.

### A. Clanton Testimony

 Appellant contends that the district court erred when it permitted Eugene Clanton, one of the informants, to testify about the Rolling 60s Crips. Specifically, Clanton testified that he was a member of the Rolling 60s Crips, and that the gang engaged in violent acts to get respect and prevent new gangs from establishing themselves. He also stated that if a member of the gang was attacked, the rest of the gang would join the fight using fists or weapons.

Clanton's lay witness testimony about general gang culture and about his experience with a different gang did not inform the jury about the activities of the MOD. Thus, the evidence was not relevant under Minn. R. Evid. 402. But we also conclude that the admission of this evidence was harmless. Other witnesses testified about the gang culture and activity of the MOD. Thus, the evidence did not substantially influence the jury's decision.

---

**3.** Minnesota Statutes § 609.229, subd. 1, defines "criminal gang" as:

... any ongoing organization, association, or group of three or more persons, whether formal or informal, that:

(1) has, as one of its primary activities, the commission of one or more of the offenses listed in section 609.11, subdivision 9;

(2) has a common name or common identifying sign or symbol; and

(3) includes members who individually or collectively engage in or have engaged in a pattern of criminal activity.

It is undisputed that the offenses described in the State's case fall within the offenses listed in Minn.Stat. § 609.11, subd. 9 (2004).

## B. Other Gang Testimony

 Appellant contends that the district court erred when it admitted certain exhibits and other lay testimony regarding the MOD gang because he stipulated to being a MOD member. The State introduced certain exhibits gathered while executing search warrants of the homes of appellant and Grogan Yang, Sai Vang, and Jason Moua. The exhibits included a CD that was accompanied by a song list. The lyrics of the first song were played several times at trial and included the phrases, "grab your Glocks when you see MOD" and "call the cops when you see 301." The State presented lay testimony regarding the meaning of the MOD, how one could join the MOD gang, and the MOD's identification with specific tattoos, hand signs, and the number "301." Several witnesses testified that they were convicted of crimes committed for the benefit of the MOD gang.

 Generally, a defendant's offer to stipulate in a criminal case should not result in limiting the introduction of relevant evidence, particularly where the evidence is relevant to other issues not covered by the stipulation. *State v. Davidson*, 351 N.W.2d 8, 10 (Minn.1984) (citing *State v. Wiley*, 295 Minn. 411, 421, 205 N.W.2d 667, 675 (1973)). But evidence that is not relevant should not be received. *Id.* Further, under Minn. R. Evid. 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."

Here, the exhibits and testimony introduced helped to establish that one of the MOD's primary activities was to commit crimes, that it had a common identifying sign or symbol, and that it was composed of members who individually or collectively engaged in criminal activity. Thus, we conclude that this evidence was relevant to issues other than those covered by the stipulation and that the district court did not abuse its discretion in admitting it.

## C. Expert Gang Testimony

 Appellant contends that Sergeant Straka's expert gang testimony (1) was duplicative, (2) caused the jury to convict him because he was in a gang, and (3) improperly stated a legal opinion.

 Minnesota Rule of Evidence 702 provides that an expert may testify "in the form of an opinion" if his or her "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." The "ultimate question of admissibility" is whether the expert's testimony will help the jury evaluate evidence or resolve factual issues. *DeShay*, 669 N.W.2d at 884. Gang expert testimony is admissible only when it adds "precision or depth to the jury's ability to reach conclusions about matters that are not within its experience." *Id.* at 888.

Straka, who was employed by the gang unit of the St. Paul Police Department, testified regarding the history of the MOD gang in Minnesota, and its association with the numbers "301," tattoos, colors, and hand signs. He testified that the primary activity of the MOD is "[t]o commit violent crimes, and to protect each other." When asked if he was "familiar with whether or not members of the MOD gang individually or collectively have engaged in a pattern of criminal behavior," Straka responded that numerous members of the MOD gang had been suspects and convicted of crimes for the benefit of a gang under Minn.Stat. § 609.229.

The district court concluded that Straka's testimony was admissible because there was conflicting evidence regarding whether the MOD was a criminal gang, whether it had a common identifying sign

or symbol, and whether it existed to commit violent acts. On this record, the testimony was not duplicative of evidence that had already been established by lay witness testimony. Rather, it was necessary to establish the elements of the for-the-benefit-of-a-gang statute. *See* 714 N.W.2d at 692.

Second, appellant contends that the jury was encouraged to convict him because he was a member of the MOD gang. Appellant cites *State v. Blanche*, where we concluded that it was error, albeit harmless, for an expert witness to testify that criminal gangs in general engage in criminal activities, shoot at each other, and retaliate against rival gangs to gain respect, because there was a risk that the jury would assume the defendant was the shooter just because he was in a gang. 696 N.W.2d 351, 373–74 (Minn.2005). Here, while Straka briefly testified about the history of Asian gangs and that gangs use colors and hand signs to indicate gang membership, his primary testimony was specific and focused on the MOD gang. Thus, *Blanche* is distinguishable.

■ Finally, appellant contends that it was improper for Straka to express his opinion that the MOD gang's primary activity was to commit violent crimes and to protect each other. Under Minn. R. Evid. 704, an expert may give his or her opinion as to an ultimate fact issue in the case if such testimony is helpful to the fact finder. Expert opinion testimony is not helpful if "the subject of the testimony is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions about that subject which is within their experience." *State v. Moore*, 699 N.W.2d 733, 740 (Minn.2005) (citation omitted) (internal quotation marks omitted). Under this "helpfulness" test, we have "not allowed ultimate conclu-

sion testimony which embraces legal conclusions or terms of art" or which simply tells the jury what conclusion to reach. *Id.* (holding it was improper to allow doctor to testify that victim's injury met the legal definition of great bodily harm) (citation omitted) (internal quotation marks omitted); *State v. Saldana*, 324 N.W.2d 227, 230–31, 231 n. 5 (Minn.1982) (holding that expert's conclusion that victim was "raped" was a legal conclusion which was of no use to the jury).

■ We conclude that it is improper for an expert to express an opinion that the MOD is a criminal gang under the statute, or that a defendant committed a crime to benefit a criminal gang because these opinions are the ultimate conclusions reserved for the jury. But it is not improper for an expert to testify regarding the underlying facts necessary to determine whether the MOD is a criminal gang or that a defendant committed a crime for the benefit of a gang. For example, an expert may present testimony as to the activities of a group, whether the group has a common name, sign, or symbol, and whether the group members individually or collectively engage in criminal activity.

Here, Straka expressed his opinion that the primary activities of the MOD were to commit violent crimes and to protect each other. Because he was not asked to express an opinion on the ultimate issues in the case, we conclude that the district court did not abuse its discretion in admitting Straka's testimony.

## V.

Appellant argues that (1) the jury instructions were confusing, disjointed, and inadequate, resulting in structural error; (2) the district court did not accurately instruct the jury on accomplice liability; (3) the district court failed to provide a definition of aiding and abetting despite

the jury's request; and (4) the district court should have cautioned the jury on the credibility of informants and cooperating codefendants.

 Failure to object to jury instructions at trial "generally constitutes a waiver of the right to appeal." *State v. White*, 684 N.W.2d 500, 508 (Minn.2004). We may review an unobjected-to instruction if there is (1) an error; (2) that is plain; and (3) affects substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). If the three prongs are met, we then consider whether to "address the error to ensure fairness and the integrity of the judicial proceedings." *Id.* We review appellant's four claims in turn.

 First, appellant argues that the jury instructions were confusing, disjointed, and inadequate because the district court interrupted its oral presentation of the instructions five times to make corrections. The State counters that appellant has not identified any error in the final jury instructions and that there was no indication of confusion by the jury during its deliberations.

The jury instructions were 31 pages in length and included over 40 possible verdict forms. Each juror was given a copy of the jury instructions. When the district court read the instructions to the jury, five interruptions occurred so that corrections could be made. The first time a change was made, the court excused the jury and made a prospective change. The second time, the court added an omitted lesser-included offense to the instructions that had been included for Counts 1 through 4,[4]

but had been omitted from Counts 5 through 8.[5] After making the correction, the court read the instruction and told the jury to apply it retroactively to Counts 5 through 8. The third correction occurred when a juror notified the court that the written instructions did not conform to the oral instructions because the word "attempted" was missing. The fourth time, prospective changes were made. The fifth time, the court instructed the jury retrospectively that a felony drug offense also fell within the definition of a crime committed for the benefit of a gang. The jury received a final set of written jury instructions with all the foregoing corrections before they began to deliberate. Appellant never objected to the process of instructing the jury.

Appellant relies on *State v. Gebremariam*, 590 N.W.2d 781, 783–84 (Minn.1999), to argue that the corrections made during the oral presentation of instructions to the jury constitute structural error that requires automatic reversal. But in *Gebremariam*, we did not refer to the jury instruction errors as structural errors. *See generally id.* Instead, we applied a harmless-error analysis and reversed and remanded because we could not determine "beyond a reasonable doubt that the errors in [the] trial court's instructions did not contribute to appellant's convictions." *Id.* at 782. We observed that "[w]e are not hesitant to affirm a conviction when the jury's instructions are corrected where it is apparent that the accused has suffered no prejudice." *Id.* at 784 n. 2. *See also Goodsell v. Taylor*, 41 Minn. 207, 210, 42 N.W. 873, 874 (1889).

---

4. Counts 1 through 4 charged appellant with aiding and abetting first-degree premeditated murder and aiding and abetting first-degree premeditated murder for the benefit of a gang for the shooting deaths of Bunsean Lieng and Tashi Jagottsang.

5. Counts 5 through 8 charged appellant with aiding and abetting first-degree premeditated attempted murder for the shooting injuries sustained by Tenzin Tsondu, Tenzin Tenpa, Tenzin Choegyal, and Tenzin Phelgye Woser.

We acknowledge that correcting jury instructions when they are read to the jury has the potential to create confusion and may, in some cases, constitute error and result in prejudice. But this is not that case. All of the errors in the instructions were identified and timely corrected by the district court before the jury began its deliberations. Neither the jury's questions during deliberations, nor its verdict, indicate that giving corrected instructions created any confusion with the jury, or that appellant suffered any prejudice. We conclude that the district court effectively cured any potential for confusion of the jury by instructing the jury to disregard the errors in the old instructions, clearly explaining the amendments to the jury, and providing the jury with the corrected instructions for its deliberations.

■ Second, appellant argues for the first time in his reply brief that the district court did not accurately instruct the jury on accomplice liability. Specifically, appellant argues that the court should have instructed the jury that the additional crimes must have been "reasonably foreseeable to the person [aiding and abetting]" and not just "reasonably foreseeable." The State filed a motion to strike this argument because it was raised for the first time in appellant's reply brief.

■ Under our rules of procedure, "[t]he reply brief must be confined to new matter raised in the brief of the respondent." Minn. R. Civ.App. P. 128.02, subd. 3. Because the State did not raise this matter in its brief, it was not proper subject matter for appellant's reply brief and, therefore, is waived and stricken.[6]

■ Third, appellant argues that the district court erred in failing to further define aiding and abetting despite a request by the jury during its deliberations to do so. Specifically, the jury requested definitions for "aiding, advising, counseling, conspiring, and intentionally." The court provided an instruction on "intentionally" and instructed the jury to refer to the "common ordinary meaning and understanding" of aiding, advising, counseling, and conspiring. Appellant did not object to these instructions.

We have concluded that " 'the trial judge may, in his discretion, give additional instructions in response to a jury's question on any point of law. The court has the discretion to decide whether to amplify previous instructions, reread previous instructions, or give no response at all.' " *State v. Laine*, 715 N.W.2d 425, 434 (Minn. 2006) (quoting *State v. Murphy*, 380 N.W.2d 766, 772 (Minn.1986)); Minn. R.Crim. P. 26.03, subd. 19(3).

Appellant relies on *Mahkuk*, 736 N.W.2d at 683, to argue that the court's failure to instruct the jury may have resulted in an improper conviction. But in *Mahkuk*, the jury instruction was erroneous because it omitted an element of a charged offense. *Id.* Here, appellant does not contend that the instructions given to the jury were incorrect. On this record, we see no abuse of discretion.

**6.** Even if we did review this claim, we would conclude that appellant's substantial rights were not affected. In *State v. Earl*, 702 N.W.2d 711, 722 (Minn.2005), we "suggest[ed]" that future jury instructions regarding aiding and abetting under Minn.Stat. § 609.05, subd. 2 (2008), contain the phrase "reasonably foreseeable to the person [liable for aiding and abetting]" instead of just "reasonably foreseeable." But the failure to include such language does not require automatic reversal, particularly when the record clearly indicates that it was reasonably foreseeable to appellant that if he aided and abetted MOD members in shooting at the Tibetans, some of the Tibetans would be injured or killed.

 Finally, appellant argues the district court erred when it denied defense counsel's request for a jury instruction about the weight to be given to the testimony provided by witnesses granted immunity[7] and codefendants. We evaluate a district court's refusal to give a jury instruction for an abuse of discretion. *State v. Swanson*, 707 N.W.2d 645, 653 (Minn. 2006). A party is entitled to a specific jury instruction if evidence exists at trial to support the instruction. *State v. Auchampach*, 540 N.W.2d 808, 816 (Minn.1995). But a court need not give a requested instruction if the substance of the instruction is already contained in the existing jury instructions. *Id.*

Here, the court instructed the jury that for purposes of impeachment, it should consider, among other things, whether a witness has been convicted of a crime. It also instructed the jury to consider such things as a witness's relationship to the parties, how the parties learned about the facts, and any other factors that might bear on their credibility. We conclude that the substance of the requested instruction was already contained in the existing jury instructions. Moreover, both the prosecutor and defense counsel emphasized that the jury should consider the deals that witnesses were given for testifying when weighing their credibility. Therefore, the district court did not abuse its discretion when it did not give the requested instruction.

## VI.

 Appellant alleges that the prosecutor's conduct in the closing argument deprived him of a fair trial. Our standard of review for claims of prosecutorial error depends on whether an objection was raised at the time of the alleged error. For claims of prosecutorial misconduct that were objected to at trial, we apply a two-tiered harmless-error test. *State v. Wren*, 738 N.W.2d 378, 389–90 (Minn. 2007). For cases involving claims of unusually serious prosecutorial misconduct, there must be certainty beyond a reasonable doubt that misconduct was harmless. *State v. Caron*, 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974). We review cases involving claims of less-serious prosecutorial misconduct to determine whether the misconduct likely played a substantial part in influencing the jury to convict. *Id.*

 For claims of prosecutorial misconduct to which a defendant did not object, we apply a modified plain-error test. *State v. Ramey*, 721 N.W.2d 294, 302 (Minn.2006). The defendant must show that the misconduct is error and that it is plain. *Wren*, 738 N.W.2d at 393. The burden then shifts to the State to demonstrate that the error did not affect the defendant's substantial rights. *Id.*

 Appellant argues that the prosecutor improperly referred to her four-year-old twins when discussing circumstantial evidence. The prosecutor explained to the jury that she knew her twins had eaten some brownies, even though they denied doing so, because they had brownie crumbs all over their chins. She told the jury that even though there was little eyewitness testimony to convict appellant, the circumstantial evidence presented was enough to find him guilty. Appellant argues that by using this example, and later discussing gang lifestyle, the prosecutor was inviting the jury to relate to her lifestyle in contrast to gang lifestyle. Appellant objected to the prosecutor's argument, but the objection was overruled.

We conclude that the prosecutor's example did not constitute error and did not

7. Lue Vang was granted immunity for an unrelated crime.

invite the jury to relate to her lifestyle while convicting appellant because of his. We observe, however, that providing the jury with personalized examples may, in some situations, create an improper appearance of currying favor with the jury.

 Next, appellant argues that the prosecutor over-emphasized the general lawlessness and violence of Asian gangs and improperly highlighted the convictions of current or former MOD gang members in order to incite racial bias and encourage the jury to convict appellant so that the streets would be safer. He also argues that the prosecutor erred when she reiterated Sergeant Straka's statement that the primary purpose of the MOD gang is the commission of violent crimes. These comments were not objected to at trial. We conclude that the prosecutor's statements were designed to meet the State's burden of proving that the crime was committed for the benefit of the MOD and that the MOD was a criminal gang. Thus, we conclude that the prosecutor's argument was not error.

 Separately, appellant contends that the cumulative impact of the limitations on cross-examination, the prejudicial gang-related testimony, the jury instruction confusion, and the prosecutorial error in closing arguments, deprived him of his due-process right to a fair trial. An appellant is "entitled to a new trial if the errors, when taken cumulatively, had the effect of denying appellant a fair trial." *State v. Keeton,* 589 N.W.2d 85, 91 (Minn.1998). Based on our review of the record, we conclude that appellant was not deprived of a fair trial.

## VII.

 Appellant argues that his aiding and abetting first-degree premeditated murder and aiding and abetting attempted first-degree premeditated murder convic-

tions must be vacated or that his sentence must be reduced because there was insufficient evidence of (1) premeditation and (2) aiding and abetting. In assessing the sufficiency of the evidence, "we make a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict." *State v. Brown,* 732 N.W.2d 625, 628 (Minn.2007). "But, when a conviction is based solely on circumstantial evidence, that evidence must be 'consistent with the hypothesis that the accused is guilty and inconsistent with any other rational hypothesis except that of guilt.'" *State v. McArthur,* 730 N.W.2d 44, 49 (Minn.2007) (quoting *Bernhardt v. State,* 684 N.W.2d 465, 477 (Minn.2004)).

### A. Premeditation

 Appellant argues that the evidence presented at trial was insufficient to prove, beyond a reasonable doubt, that the shootings were premeditated. A person who "causes the death of a human being with premeditation and with intent to effect the death of the person" is guilty of first-degree murder. Minn.Stat. § 609.185(a)(1) (2008). Premeditation means "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18 (2008). Premeditation is "generally proven through circumstantial evidence" and often inferred from the totality of circumstances surrounding the killing. *State v. Hughes,* 749 N.W.2d 307, 312 (Minn.2008) (citation omitted) (internal quotation marks omitted). We consider three categories of evidence relevant to an inference of premeditation: planning activity, motive, and the nature of the killing. *Id.* at 313.

■ While "[a] finding of premeditation does not require proof of extensive planning or preparation to kill," or "require any specific period of time for deliberation," *State v. Cooper*, 561 N.W.2d 175, 180 (Minn.1997), the State "must prove that *some appreciable period of time* passed after the defendant formed the intent to kill, during which the statutorily required consideration, planning, preparation, or determination took place," *State v. Moua*, 678 N.W.2d 29, 39 (Minn.2004) (emphasis added). Previously, we concluded that the defendant had sufficient time to formulate a plan between the time he saw the victim from the bottom of a flight of stairs and the time he reached the top of the stairs and shot the victim, *State v. Austin*, 332 N.W.2d 21, 25 (Minn.1983), and between the time a defendant carried a gun from his living room to the outside of his home, *State v. Rainer*, 411 N.W.2d 490, 496 (Minn.1987).

■ Appellant argues that the possession of weapons by the MOD members at the pool hall is not evidence of planning activity because MOD gang members always carry weapons with them. But even if possession of weapons is not evidence of planning activity, we conclude that other evidence of planning activity is sufficient. Specifically, MOD gang members harassed the Tibetans in the parking lot outside of the pool hall. After the altercation inside the pool hall, gang members chased the Tibetans out of the pool hall and fired shots at them.

■ When assessing a defendant's motive, we consider "threats by the defendant, conduct by the victim known to have angered the defendant, and plans or desires of the defendant that would be furthered by the victim's death." *McArthur*, 730 N.W.2d at 49. Here, a "verbal confrontation" occurred in the alley when MOD members, including appellant, yelled at the Tibetans, and threw gang signs. Later, the Tibetans, one of whom was armed with a bat, reentered the pool hall to confront the MOD members, and an ensuing fight broke out. Thus, the threats and fighting provided strong evidence of motive.

Our conclusion is supported by our decision in *State v. Holliday*, 745 N.W.2d 556, 559–60 (Minn.2008). In *Holliday*, a fight erupted inside a theatre in downtown Minneapolis, with people fighting, screaming, and throwing chairs. *Id.* at 559. After police ordered everyone outside, two groups formed, screaming at each other. *Id.* at 559–60. After a member of the opposing group reached behind his back, the defendant pulled out a revolver and pointed it at the group. *Id.* As the group fled, he fired multiple shots, killing an innocent bystander. *Id.* The defendant argued that he had no motive to shoot at the opposing group to kill them, but rather shot into the air to scare people away. *Id.* at 561. We concluded that the context of the "verbal confrontation" between the two opposing groups and the other person's alleged act of reaching behind his back provided a motive for the defendant to shoot at that group. *Id.* at 563.

■ Also, we consider the nature of the killing and whether the killing was "so particular and exacting that the defendant must have intentionally killed according to a preconceived design." *McArthur*, 730 N.W.2d at 50 (citation omitted) (internal quotation marks omitted). Evidence considered "includes the number of wounds inflicted, infliction of wounds to vital areas, infliction of gunshot wounds from close range, passage of time between infliction of wounds, and a defendant's concern with escape rather than with rendering aid to the victim." *Id.* In *McArthur*, we concluded that there was significant evidence regarding the nature of the killing when the

defendant fired multiple shots, shot the victim in the head from behind and at close range, and fled the scene following the shooting. *Id.* In *Holliday,* we concluded that the manner of the killing supported premeditation when the defendant chased and aimed his revolver at a specific person, although killing a different person, fired multiple shots, did not give aid to the victim, and fled the scene. 745 N.W.2d at 564.

Here, the manner of killing supports premeditation. Lorenzo Brown testified that appellant told him he shot at one of the Tibetans with the intent to kill him. Further, at least nine shots were fired. Appellant fled the scene with other MOD gang members and showed no concern for the injuries sustained by the Tibetans. Like *McArthur* and *Holliday,* we conclude that the nature of the killing in this case supports the jury's finding of premeditation.

### B. Aiding and Abetting

■■■■ According to appellant, none of the eye-witnesses implicated him and the weapons found in the vehicle he occupied were not tied to the shooting. Also, Bunsean Lieng's shooting in the parking ramp occurred after appellant had fled.

■■■■ Accomplice liability is created when a defendant "was intentionally present at the scene of the crime, knew his accomplices were going to commit a crime, and intended his presence to further that crime." *State v. Pendleton,* 759 N.W.2d 900, 910 (Minn.2009). "Presence, companionship, and conduct before and after an offense are circumstances from which a person's criminal intent may be inferred." *State v. Russell,* 503 N.W.2d 110, 114 (Minn.1993). Active participation in an offense is not required. *State v. Ostrem,* 535 N.W.2d 916, 924–25 (Minn.1995). But there must still be "some knowing role in

the commission of the crime by a defendant who takes no steps to thwart its completion." *Id.* at 925.

Viewed in the light most favorable to the verdict, the evidence establishes that appellant was present at the party with other MOD members shortly before the shooting, that Grogan Yang and appellant were passengers in Sai Vang's Honda car when it drove by the Tibetans in the alley by Jimmy's, and that Grogan Yang and appellant yelled at and harassed the Tibetans. Subsequently, when the Tibetans entered the pool hall to confront Grogan Yang for harassing them, appellant came to Yang's defense. Appellant participated in chasing the Tibetans out of the pool hall and then fired shots at the Tibetans in the alley. Appellant did not object to other MOD members shooting at the Tibetans, and fled the scene along with other gang members. We conclude that there was sufficient evidence to prove that appellant actively participated in the shootings of the Tibetans, and that he intended his presence to further the commission of these crimes.

■■■■ Appellant also argues that he had fled the scene before Bunsean Lieng was shot in the parking ramp. But "[a] person liable [as an aider and abettor] is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by the person as a probable consequence of committing or attempting to commit the crime intended." Minn. Stat. § 609.05, subd. 2 (2008). A "defendant charged as an accomplice to first-degree murder is not required to have predicted with certainty that a companion would intentionally murder the victim— only that the murder was reasonably foreseeable as a probable consequence of the intended crime." *State v. Pierson,* 530 N.W.2d 784, 789 (Minn.1995). Additional deaths were reasonably foreseeable to ap-

pellant as a probable consequence of shooting at the Tibetans in the alley behind Jimmy's. Therefore, there is sufficient evidence to support the jury's finding of aiding and abetting.

## VIII.

■ Appellant received two consecutive life sentences for aiding and abetting first-degree murder for the benefit of a gang, and four consecutive 186–month sentences for aiding and abetting attempted first-degree murder for the benefit of a gang. He argues that imposing permissive consecutive sentences unfairly exaggerates the criminality of his convictions and amounts to excessive punishment under the Eighth and Fourteenth Amendments to the U.S. Constitution and Article 1, § 8 of the Minnesota Constitution.

■ We will not disturb a district court's decision to impose permissive consecutive sentences absent a clear abuse of discretion. *State v. McLaughlin*, 725 N.W.2d 703, 715 (Minn.2007). The district court abuses its discretion in imposing consecutive sentences when the resulting sentence unfairly exaggerates the criminality of the defendant's conduct. *State v. Hough*, 585 N.W.2d 393, 397 (Minn.1998).

While Minn.Stat. § 609.035 (2006) generally bars multiple convictions for a defendant's single course of conduct, we have created an exception when multiple victims are involved. *State v. Schmidt*, 612 N.W.2d 871, 878 (Minn.2000). Here, consecutive sentencing was permissive because appellant committed crimes against multiple persons. Minn. Sent. Guidelines II.F (2004).

■ In determining whether a sentence has exaggerated the criminality of a defendant's conduct, we take guidance from past sentences imposed on similarly situated defendants, *McLaughlin*, 725

N.W.2d at 715, to consider whether "the sentences are commensurate with the defendant's culpability," *State v. Warren*, 592 N.W.2d 440, 451–52 (Minn.1999). Several similarly situated cases guide our decision. In *Blanche*, we held that consecutive sentencing of conspiracy and first-degree murder convictions did not exaggerate a defendant's criminality when the defendant fired ten bullets indiscriminately in a residential area and hit an 11–year–old child on the front porch of the child's friend's house. 696 N.W.2d at 379. In *State v. Dukes*, we upheld consecutive sentences for first-degree murder and attempted first-degree murder when the crimes involved a shooting rampage that threatened innocent bystanders and targeted innocent victims at random. 544 N.W.2d 13, 20 (Minn.1996).

Appellant's crimes created a significant risk to the community. Like *Blanche*, appellant's conduct resulted in the shooting deaths of two individuals, and the shooting and resulting injuries to four other individuals. Appellant played an active role in the shooting and aided and abetted other MOD gang members in the shooting.

Appellant argues that the Tibetans "were the catalysts to the fight" and that the fight was "spontaneous and not preplanned." According to appellant, aiders and abettors who act as "passive participants" should receive a lesser punishment than the principal actor. We have distinguished sentences for accomplices after-the-fact, who provide aid to the principal offenders after the victimization has occurred, from "coconspirators, or 'accomplices *before* the fact,' under Minn.Stat. § 609.05[ ], who are considered to commit crimes against the victims of a principal perpetrator, even if the coconspirators do not directly harm the victims." *State v. Skipintheday*, 717 N.W.2d 423, 426 (Minn. 2006) (citation omitted). While noting that

it may not always be the case, in *Skipintheday* we concluded that an accomplice after-the-fact should not be subject to multiple sentences. *Id.* at 427 n. 5.[8]

Here, appellant was more than a "passive participant." He played an active role in victimizing the Tibetans. Testimony established that appellant participated in the harassment of the Tibetans as his car drove into the alley and fired multiple gunshots up the alley at the Tibetans with the intent to kill them.

Next, appellant argues that consecutive sentences given to an aider and abettor unfairly exaggerate the criminality of his conduct. But appellant provides no legal support for this argument. As an aider and abettor, appellant is legally responsible for the acts of the other MOD gang members. Here, appellant was an active participant in the criminal conduct. Moreover, we have previously affirmed consecutive sentences given to an accomplice. *See, e.g., State v. Dukes*, 544 N.W.2d at 20. Consequently, we reject appellant's argument.

▆▆ Appellant also contends that the district court improperly considered that his demeanor in court gave the impression of a lack of remorse when deciding to impose consecutive sentences. "As a general rule, a defendant's remorse bears only on a decision whether or not to depart dispositionally, not on a decision to depart durationally or with respect to consecutive service." *State v. Back*, 341 N.W.2d 273, 275 (Minn.1983). The record reflects that the court considered appellant's demeanor in terms of weighing the seriousness of appellant's actions but not necessarily in imposing consecutive sentences.

In summary, we conclude that the district court did not abuse its discretion in

imposing permissive consecutive sentences, and that the sentences imposed did not unfairly exaggerate the criminality of appellant's conduct.

## IX.

▆▆ Appellant argues that the postconviction court erred in summarily denying his request for postconviction relief and his motion for reconsideration and leave to amend. On review from a summary denial of a petition for postconviction relief, we examine whether sufficient evidence exists to support the district court's findings and will reverse only upon proof that the district court abused its discretion. *Bonga v. State*, 765 N.W.2d 639, 642 (Minn.2009). We review de novo the postconviction court's findings of fact for an abuse of discretion and questions of law. *Id.*

▆▆ A person convicted of a crime may file a petition for postconviction relief under Minn.Stat. § 590.01, subd. 1 (2004). "Allegations in a postconviction petition must be 'more than argumentative assertions without factual support.'" *Leake v. State*, 737 N.W.2d 531, 535 (Minn.2007) (citation omitted). The postconviction court must hold an evidentiary hearing "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn.Stat. § 590.04, subd. 1 (2008). "Any doubts as to whether to conduct an evidentiary hearing should be resolved in favor of the party requesting the hearing." *State v. Rhodes*, 627 N.W.2d 74, 86 (Minn.2001).

▆▆ To demonstrate ineffective assistance of counsel, appellant must show that (1) his counsel's performance fell below an objective standard of reasonableness, and

---

**8.** In *Skipintheday* we make a distinction between a defendant who aids in victimizing others and one who aids after the victimization has occurred.

(2) that a reasonable probability exists that, but for his counsel's unprofessional errors, the result of the proceedings would have been different. *State v. Rhodes,* 657 N.W.2d 823, 842 (Minn.2003).

■ In his postconviction petition, appellant alleged that his trial counsel was ineffective because he did not object to the admissibility of the MOD CD, Eugene Clanton's testimony about the Rolling 60s gang, and the prosecutor's closing argument that referenced gang evidence. The postconviction court denied his petition.

In his motion for reconsideration and for leave to amend, appellant asked the postconviction court to reconsider its order denying his petition and sought to add two new claims. The court rejected the motion to reconsider and concluded that the new claims were *Knaffla*-barred and, alternatively, without merit.

■ In *State v. Knaffla,* we held that if a direct appeal has been taken on a conviction, all claims raised in that appeal, and all claims known at the time of that appeal but not raised, are procedurally barred and will not be considered in a subsequent petition for postconviction relief. 309 Minn. 246, 252, 243 N.W.2d 737, 741 (1976); *see also Leake,* 737 N.W.2d at 535. Also, "matters raised or known but not raised in an earlier petition for postconviction relief will generally not be considered in subsequent petitions for postconviction relief." *Powers v. State,* 731 N.W.2d 499, 501 (Minn.2007).

■ The *Knaffla* rule is subject to two exceptions: (1) if a claim is known to a defendant at the time of the direct appeal but is not raised, it will not be barred by the rule if the claim's novelty was so great that its legal basis was not reasonably available when direct appeal was taken; and (2) even if the claim's legal basis was sufficiently available, substantive review may be allowed when fairness so requires and when the petitioner did not deliberately and inexcusably fail to raise the issue on direct appeal. *Leake,* 737 N.W.2d at 535.

The postconviction court's orders denying the petition and motion to reconsider are supported by the record. Contrary to appellant's contention, his counsel did object to the admissibility of the MOD CD. While Clanton's gang testimony was admitted in error, it did not substantially influence the jury's decision, and therefore was harmless. Because the prosecutor's closing argument that referenced gang evidence did not constitute error, appellant's counsel was not ineffective when he did not object to it.

■ Additionally, because postconviction courts treat motions to amend after postconviction relief has been denied as new petitions for postconviction relief, *Perry v. State,* 753 N.W.2d 664, 666 n.2 (Minn. 2008), *Ford v. State,* 690 N.W.2d 706, 708 (Minn.2005), the postconviction court did not err when it treated appellant's motion to amend as a second postconviction petition, and concluded that appellant's new claims were *Knaffla*-barred. Appellant argues that he was denied effective assistance of counsel because his trial counsel coerced him into not testifying at trial. He also argues that he was denied a fair trial because of systematic exclusion of Asians from jury panels in Anoka county. The legal basis for these claims was available at the time of appellant's first postconviction petition. Also, appellant failed to establish that fairness requires us to review these claims.

Affirmed.